John P. PRATT, Plaintiff and Appellee,

v.

PRODATA, INC., an Idaho corporation doing business in Utah as Pro–Star, Will McCoy, an individual, and Does 1 through 5, Defendants and Appellants.

No. 910248.

Supreme Court of Utah.

Aug. 25, 1994.

Berne S. Broadbent, Salt Lake City, for plaintiff.

Eric C. Olson, Salt Lake City, for defendants.

ZIMMERMAN, Chief Justice:

Defendants Will McCoy and Prodata, Inc., appeal from a jury verdict in favor of plaintiff John Pratt. The jury found that defendants intentionally interfered with Pratt's prospective economic relations with the Utah Department of Transportation ("UDOT"). On appeal, defendants contend that (i) several of the jury's findings are not supported by sufficient evidence; (ii) the jury's finding on proximate cause is unsound as a matter of law; and (iii) a judgment for intentional interference with economic relations cannot be based on the transmission of truthful information.

We reject each of defendants' contentions and affirm the jury verdict.

On appeal from a jury verdict, we view the evidence and all reasonable inferences drawn therefrom in the light most favorable to that verdict. *State v. Dunn,* 850 P.2d 1201, 1205–06 (Utah 1993); *State v. Hamilton,* 827 P.2d 232, 233–34 (Utah 1992). We recite the facts of this case accordingly.

Prodata provides computer programmers to government agencies and private industry on a contract basis. Prodata hired Pratt, a computer programmer, in September of 1985. In connection with his employment, Pratt signed a contract entitled "Non–Disclosure/Non–Compete Employment Agreement" (the "Employment Agreement"). In part, this agreement prohibited Pratt from forming or participating in a competing business within fifty miles of Salt Lake City for one year following its termination (the "Noncompete Covenant"). The Noncompete Covenant provided for liquidated damages in the amount of $25,000 as the exclusive remedy for a violation of its terms. Pratt terminated the Employment Agreement on May 1, 1988.[1]

On February 27, 1989, approximately two months before the Noncompete Covenant was to expire, Pratt began working as an independent contractor for UDOT. McCoy, Prodata's Salt Lake City manager, first became aware that Pratt was employed at UDOT during the summer of 1989. McCoy testified that after learning of Pratt's employment at UDOT, he immediately reviewed the Employment Agreement and concluded that Pratt had not violated any part of the agreement, including the Noncompete Covenant. Indeed, Pratt's subsequent work at UDOT did not hinder Prodata from performing work for UDOT during that same period. Nevertheless, during this period McCoy asserted that Pratt had taken contract work away from Prodata and stated that Prodata was going to "make an example" of Pratt. McCoy also told at least one Prodata employee to stay away from Pratt and openly accused Pratt of unethical conduct.

On September 27, 1989, McCoy approached UDOT and asked for a meeting regarding Pratt.[2] McCoy had been employed at UDOT as its comptroller and was acquainted with the management personnel. He told UDOT that he believed it had hired Pratt in violation of his Noncompete Covenant. McCoy also indicated to UDOT that he thought the payment of money to Pratt for services completed between February 27th and April 30th was in violation of state procurement procedures because there was not a written contract between UDOT and Pratt during that period.

UDOT agreed to investigate Prodata's claims. On September 29, 1989, a UDOT employee prepared and presented a memorandum to Eugene H. Findlay, the director of UDOT, which concluded that the procedures used in selecting, contracting with, and paying Pratt violated the Utah Procurement Code. *See* Utah Code Ann. §§ 63–56–1 to –73. That same day, Neal Christensen, a member of UDOT management, met with McCoy at Prodata's offices and requested to see Pratt's contract. McCoy refused to provide the actual document and instead provided a blank contract showing the essential terms of the Noncompete Covenant.

Based on the memorandum and the contract information provided by Prodata, Findlay concluded that Pratt should be terminated until he resolved his differences with Prodata. On October 2, 1989, UDOT notified Pratt that it was terminating his contract because of the Noncompete Covenant and that UDOT would be happy to reinstate Pratt when he had resolved his problems with Prodata. This was the first time Pratt was made aware that he had a contractual disagreement with Prodata.

After UDOT terminated Pratt, he met with McCoy to discuss the contract dispute. McCoy told Pratt that if Pratt would pay

---

1. Although Pratt terminated the Employment Agreement in May of 1988, he did not leave Prodata until March 29, 1991. During this intervening period, he worked as an independent contractor under a separate contract.

2. Later in 1989, before McCoy's meeting with UDOT but after he made the referenced statements, McCoy reexamined the contract and discovered that Pratt in fact had violated the Noncompete Covenant.

Prodata $4000 for his violation of the Noncompete Covenant, Prodata would clear Pratt to work at UDOT. Pratt felt that he had not violated the agreement and refused to pay. UDOT never rehired him because he could not work out his problems with Prodata. Pratt subsequently filed this suit, claiming that Prodata and McCoy had intentionally interfered with his prospective economic relations.

Under our decision in *Leigh Furniture & Carpet Co. v. Isom,* 657 P.2d 293, 304 (Utah 1982), a defendant is liable for intentional interference with prospective economic relations if the plaintiff proves "(1) that the defendant intentionally interfered with the plaintiff's existing or potential economic relations, (2) for an improper purpose or by improper means, (3) causing injury to the plaintiff." This case focuses on the second of these three elements: *Leigh*'s "improper purpose or improper means" requirement. An "improper means" is shown when the plaintiff proves that the defendant's means of interference were contrary to statutory, regulatory, or common law or violated " 'an established standard of a trade or profession.' " *Id.* at 308 (quoting *Top Serv. Body Shop, Inc. v. Allstate Ins. Co.,* 283 Or. 201, 582 P.2d 1365, 1371 & n. 11 (1978)). The alternative, "improper purpose," is satisfied when the plaintiff proves that the defendant's ill will predominated over all legitimate economic motivations. *Id.* at 307. According to *Leigh,* a finding of improper purpose is entirely consistent with a finding that the defendant's means were proper. *Id.*

At trial, Pratt contended both that the defendants had utilized an improper means and that they had acted with an improper purpose. As the basis for his improper-means claim, Pratt relied on the common law tort of intentional misrepresentation. To prevail under this common law theory, the jury would have had to find that the statements were false. The jury found that Prodata did not make false statements to UDOT and, therefore, rejected Pratt's improper-means claim. The jury did find, however, that defendants acted with an improper purpose in interfering with Pratt's relations with UDOT. On the improper-purpose prong of

the claim, Pratt adduced evidence of McCoy's and Prodata's ill will toward him and suggested that defendants' primary motivation in interfering with Pratt's employment by calling attention to his breach of the Noncompete Covenant was hostility toward Pratt rather than any valid economic concern. The jury found an improper purpose, and the district court entered judgment for Pratt. Defendants appeal.

We begin our analysis by examining defendants' claim that several findings of the jury are not supported by sufficient evidence. This argument is directed to each of the following findings: (i) defendants acted for an improper purpose in interfering with Pratt's economic relations; (ii) defendants' actions were the proximate cause of Pratt's damages; (iii) defendants failed to act in good faith and were thus not privileged to interfere with Pratt's economic relations; and (iv) Pratt neither recognized the risk of harm to himself by reason of defendants' actions nor intentionally or heedlessly failed to protect his own interests. Prodata also assails, on the ground that it is not supported by sufficient evidence, the jury's conclusion that Prodata did not suffer any damages as a result of Pratt's breach of the Noncompete Covenant.

We dispose of defendants' sufficiency-of-the-evidence claims by adhering to a well-established principle of appellate review: This court will upset a jury verdict "only upon a showing that the evidence so clearly preponderates in favor of the appellant that reasonable people would not differ on the outcome of the case." *E.A. Strout W. Realty Agency, Inc. v. W.C. Foy & Sons, Inc.,* 665 P.2d 1320, 1322 (Utah 1983); *accord Bundy v. Century Equip. Co.,* 692 P.2d 754, 758 (Utah 1984). "The burden on an appellant to establish that the evidence does not support the jury's verdict and the factual findings implicit in that verdict ... is quite heavy." *Cambelt Int'l Corp. v. Dalton,* 745 P.2d 1239, 1242 (Utah 1987). "To successfully attack the verdict, an appellant must marshal all the evidence supporting the verdict and then demonstrate that, even viewing the evidence in the light most favorable to that verdict, the evidence is not sufficient to support it."

*Von Hake v. Thomas,* 705 P.2d 766, 769 (Utah 1985) (citing *Scharf v. BMG Corp.,* 700 P.2d 1068, 1070 (Utah 1985)).

■ There is substantial credible evidence in the record to support the jury's determination that defendants interfered with Pratt's economic relations for an improper purpose and without privilege, that defendants' interference was the proximate cause of Pratt's damages, and that Pratt did not intentionally or heedlessly fail to protect his own interests. Defendants expressed a consistent and open hostility for Pratt after he disassociated himself from Prodata. Rather than suing Pratt for breach of the Noncompete Covenant as it was legally entitled to do, Prodata utilized its contacts at UDOT to have Pratt fired. Prodata took this course of action even though the Noncompete Covenant had already expired and therefore could no longer be legally used to bar Pratt from working at UDOT. Finally, defendants used the Noncompete Covenant to threaten substantial liability and to demand a substantial payment from Pratt when it knew that it had not suffered any actual damages from the breach. Thus, on the facts before it, the jury could have found something akin to extortion in defendants' motivation.[3]

Similarly, there is substantial credible evidence in the record from which the jury could have determined that Prodata suffered no damages as a result of Pratt's breach of the Noncompete Covenant. "As was its prerogative to do, the jury chose to believe [Pratt's] testimony and to discredit that of defendant[s] on the issues. Being supported by competent evidence, the verdict must stand." *Bundy,* 692 P.2d at 758.

We also reject defendants' attack on the legal sufficiency of the jury's proximate cause finding. Defendants claim that Pratt was the sole legal cause of his damages, citing "considerations of common sense and public policy." In support of their position, defendants assert the following: (i) UDOT was willing to let Pratt return to work as soon as Pratt resolved his dispute with defendants; (ii) defendants were willing to settle the dispute upon Pratt's agreement to pay them approximately $4000; and (iii) the $4000 that defendants requested to settle was less than Pratt was potentially liable for under the Noncompete Covenant and less than Pratt lost by refusing to settle the dispute.

Defendants assert that the "facts" set out in the preceding paragraph obligated Pratt to minimize his damages by settling the dispute. Surprisingly, they make this assertion even though the jury specifically found that defendants had suffered no damages as a result of Pratt's breach of the Noncompete Covenant. Thus, Pratt was not legally obligated to pay defendants anything. *See Young Elec. Sign Co. v. United Standard W., Inc.,* 755 P.2d 162, 164 (Utah 1988). In addition, by acceding to defendants' demand and paying them to settle the dispute, Pratt would have lost any cause of action he might have had against them for their tortious conduct. Under defendants' view of the matter, Pratt was obligated to submit to their demand for money, even though a jury ulti-

---

3. The author of this opinion has grave doubts about the future vitality of *Leigh*'s improper-purpose prong, especially in the context of commercial dealings. *Leigh* recognized that "[p]roblems inherent in proving motivation or purpose make it prudent for commercial conduct to be regulated for the most part by the improper means alternative, which typically requires only a showing of particular conduct." 657 P.2d at 307. Yet the operative test set out in *Leigh*—a test under which all relevant considerations are issues of fact, which insulates improper-purpose findings from meaningful appellate review—gives no guidance as to which activities qualify as "commercial conduct" and provides no standards by which a court or jury can determine when to apply the improper-purpose test to "commercial conduct." Absent such standards, *Leigh*'s improper-purpose test creates a trap for

the wary and unwary alike: business practices that are found to be "proper means" by a finder of fact and may otherwise be regarded as wholly legitimate under our capitalistic economic system may be recast through a jury's unguided exercise of its moral judgment into examples of spite or malice. For example, the enforcement of a binding, valid contractual noncompete provision can result in liability under *Leigh* merely upon a jury finding of some ill-defined "improper purpose." For these reasons, the author of this opinion thinks *Leigh*'s improper-purpose test should be revisited and recast to minimize its potential for misuse.

However, neither McCoy nor Prodata has asked this court to modify *Leigh*'s improper-purpose prong. Therefore, the issue of whether lawful means can result in liability for an improper purpose is not before the court today.

mately found that their demand lacked legal justification. This argument flies in the face of reason. Pratt was not obligated to yield "'to a wrongful demand by [a] wrongdoer to save the wrongdoer from the legal consequence of his own error.'" *Hector, Inc. v. United Sav. & Loan Ass'n,* 741 P.2d 542, 546 (Utah 1987) (quoting 22 Am.Jur.2d *Damages* § 32, at 55 (1965)).

■ Finally, we reject defendants' assertion that under *Leigh* a judgment for intentional interference with economic relations cannot be based on the transmission of truthful information. In so asserting, defendants rely heavily on section 772(a) of the Restatement (Second) of Torts. Section 772(a) states:

> One who intentionally causes a third person not to perform a contract or not to enter into a prospective contractual relation with another does not interfere improperly with the other's contractual relation, by giving to the third person ... truthful information....

Restatement (Second) of Torts § 772(a) (1979).

Defendants' reliance on section 772(a) is misplaced. As our decision in *Leigh* makes clear, this court has rejected the various Restatement formulations of the tort of intentional interference with economic relations. *Leigh,* 657 P.2d at 304. Under *Leigh,* "the alternative of improper purpose (or motive, intent, or objective) will support a cause of action for intentional interference with prospective economic relations *even where the defendant's means were proper." Id.* at 307 (emphasis added). Because we explicitly rejected the Restatement versions of the tort in *Leigh* and because liability may attach under *Leigh* even where a defendant's means were proper, we reject defendants' call to adopt truthfulness as an absolute defense to the tort of intentional interference with prospective economic relations.[4]

Affirmed.

I concur, with the following reservation. Defendants made no objections to jury instructions which defined "improper purpose" and "privilege" but which instructions did not state that the transmittal of truthful information was a defense to an "improper purpose." Nor did defendants make any request for an instruction to that effect. It was not until after the trial, in motions for judgment notwithstanding the verdict or for a new trial, that defendants first asserted in the trial court that the giving of truthful information should not be the basis of an improper purpose.

We therefore are foreclosed from considering on this appeal whether our decision in *Leigh Furniture & Carpet Co. v. Isom,* 657 P.2d 293 (Utah 1982), should be limited by our adopting section 772(a) of the Restatement (Second) of Torts, as urged by defendants. I would be willing to consider that issue when it is properly before us in a future case.

STEWART, Associate Chief Justice, concurring in the result:

I concur in the lead opinion except for footnotes 3 and 4, which express the author's doubt about the vitality of the improper-purpose prong of *Leigh Furniture & Carpet Co. v. Isom,* 657 P.2d 293 (Utah 1982). Concededly, that prong, if construed broadly, could seriously interfere with the forces of competition in the marketplace when competitors seek to take business away from others by lowering prices or by blaming other means that harm a competitor. Certainly, such "commercial conduct cases" do not fall within the scope of an improper-purpose test when the conduct is legitimate competitive conduct, such as is recognized under the antitrust laws.

Like any other watershed case, *Leigh Furniture* did not, and could not, deal with every possible fact situation to which the principles enunciated therein might be applied. It is,

4. As indicated above, the author of this opinion has grave doubts about the soundness of the language in *Leigh* that permits use of a lawful means to result in liability if used for an "im-

proper purpose." Nevertheless, a reconsideration of that facet of *Leigh* was not sought below and is not before the court today.

indeed, the strength of the common law that general principles of law receive definition and limitation over time by their application in specific fact situations. This is the first case to arise under the improper-purpose test of *Leigh Furniture* since it was decided. In my view, it reaches an appropriate result and demonstrates the soundness of the improper-purpose prong, at least on the facts of this case. Defendants' action in harming Pratt was entirely gratuitous. Prodata could have sued Pratt for violation of the noncompetition covenant if it indeed had thought that Pratt had violated his contract and that Prodata had suffered some damage giving rise to a valid cause of action. Prodata, for whatever reasons, did not do that. Instead, it undertook to harm Pratt by virtue of a certain kind of personal leverage that it apparently had with UDOT by inducing UDOT to fire Pratt. Infliction of gratuitous harm of that sort ought not to be acceptable under the law.

The implication, if such it be, in the lead opinion that plaintiff has an action for extortion is not correct. If plaintiff had no course of action under *Leigh Furniture*, he would have no remedy for the wrong in this case.

DURHAM, J., concurs in the concurring opinion of STEWART, Associate C.J.

HALL, J., heard the arguments but retired before he could act on the opinion.