*This opinion is subject to revision before final
publication in the Pacific Reporter*

**2015 UT 21**

IN THE

## SUPREME COURT OF THE STATE OF UTAH

JOSEPH ELDRIDGE, LINDSEY ELDRIDGE, HARRISON COMPANIES, LLC,
and HARRISON COMPANIES PROPERTY MANAGEMENT, LLC,
dba EMPIRE LUXURY LODGING,
*Appellees*,
*v.*
DAVID JOHNDROW,
*Appellant*.

No. 20130263
Filed January 30, 2015

Third District, Silver Summit Dep't
The Honorable Ryan M. Harris
No. 120500564

Attorneys:

Scott A. Dubois, Joseph E. Wrona, Gregory D. Marchant, Draper,
Timothy R. Pack, Park City, for appellees

Milo Steven Marsden, Gregory Saylin, Tyson C. Horrocks,
Salt Lake City, for appellants

JUSTICE DURHAM authored the opinion of the Court, in which
ASSOCIATE CHIEF JUSTICE NEHRING, JUSTICE PARRISH, JUSTICE LEE,
and JUDGE HRUBY-MILLS joined.

Having recused himself, CHIEF JUSTICE DURRANT does not
participate herein; DISTRICT JUDGE HRUBY-MILLS sat.

JUSTICE DURHAM, opinion of the Court:

### INTRODUCTION

¶1     This appeal concerns claims for tortious interference with
economic relations by Joseph and Lindsey Eldridge against David
Johndrow. Johndrow moved for summary judgment, and the district
court partially granted his motion, concluding there was no evidence
that he had interfered with the Eldridges' economic relations
through an improper means. But the court denied summary
judgment for the Eldridges' claims based on the allegation that
Johndrow had acted with an improper purpose.

¶2     According to our decision in *Leigh Furniture & Carpet Co.
v. Isom*, "improper purpose . . . will support a cause of action for

intentional interference with prospective economic relations even where the defendant's means were proper." 657 P.2d 293, 307 (Utah 1982). *Leigh Furniture* recognized, however, that this doctrine posed risks. There are "[p]roblems inherent in proving motivation or purpose," and if juries were allowed to find improper purposes too easily, it would result in tort liability for much legitimate "competitive commercial activity." *Id.* We therefore sought to circumscribe the doctrine by allowing improper-purpose liability only where "the improper purpose predominate[s]" and by counseling that it would usually be "prudent" not to apply the doctrine to "commercial conduct." *Id.*

¶3    Unfortunately, as the few subsequent cases allowing improper-purpose liability demonstrate, our efforts to circumscribe the doctrine have failed. *Infra* ¶¶ 46–50. Because of this failure, little law exists to guide juries' improper-purpose findings or to inform private parties of their legal rights and obligations. *Infra* ¶¶ 51–54. Consequently, if improper-purpose claims became commonplace, their unpredictable nature would deter much socially beneficial speech and conduct.

¶4    We could attempt to ameliorate this lawlessness by further refining the improper-purpose doctrine; for example, we could establish safe harbors like the Restatement's rule that the communication of truthful information never constitutes tortious interference. *See* RESTATEMENT (SECOND) OF TORTS § 772(a) (1979). But we are persuaded that the doctrine's flaws warrant not repair but rejection. We therefore hold that no tortious interference claim can succeed without evidence of improper means.

## BACKGROUND[1]

¶5    Appellees Joseph and Lindsey Eldridge are the owners and operators of Harrison Companies, LLC, and Harrison Companies Property Management, LLC. Through these limited liability companies, the Eldridges manage residential property and provide various other services for wealthy homeowners in Summit County. Because providing these services means taking responsibility for clients' homes, the Eldridges' success depends a great deal on their reputation.

---

[1] Because the matter reaches us on appeal from a denial of Johndrow's summary judgment motion, we recite the facts in the light most favorable to the Eldridges' claim. *See Glenn v. Reese*, 2009 UT 80, ¶ 6, 225 P.3d 185.

¶6 Appellant David Johndrow is a former friend and client of the Eldridges who used to recommend their services to his friends and other associates in the area. But the friendship lasted only a year. Lindsey Eldridge accused Mr. Johndrow of attacking her at a restaurant, and Mr. Johndrow accused the Eldridges of spreading false rumors and stealing his mobile phone. The once amicable relationship gave way to threats of legal action.

¶7 The action Johndrow actually took, however, did not involve a lawsuit. Instead, he "turned [the matter] over" to an "investigative team," which discovered various embarrassing facts about the Eldridges: liens, a foreclosure, an old felony conviction, and unflattering news reports from before they moved to Utah. Mr. Johndrow threatened that if the Eldridges refused to retract their accusations and compensate him for the allegedly stolen phone, he would have to protect his "credibility" by revealing what he had found to the people to whom he had recommended the Eldridges. When the Eldridges did not accede to his demands, he emailed embarrassing information to "at least nine" of the Eldridges' institutional clients and communicated it verbally to a number of their individual clients.

¶8 The Eldridges sued, asserting several theories of liability: tortious interference with economic relations, tortious interference with prospective economic relations, defamation, false light, and intentional infliction of emotional distress. The tortious interference theories each rested on two separate allegations: first, that by defaming the Eldridges, Mr. Johndrow had interfered with their economic relations through an improper means; and second, that because Mr. Johndrow's only goal was to hurt the Eldridges' business, he had interfered with their economic relations in pursuit of an improper purpose.[2]

¶9 After preliminary discovery, Mr. Johndrow moved for summary judgment on the tortious interference claims, the defamation claim, and the false light claim. The district court concluded that the information Johndrow had disseminated was "at least substantially true" and "not susceptible to a defamatory interpretation." It therefore granted summary judgment on the defamation and false light claims. Further, because the "improper

---

[2] Initially, one of the Eldridges' tortious interference claims also rested on a third allegation: that Johndrow had "harass[ed], intimidate[ed], threaten[ed], and bull[ied]" Ms. Eldridge. The Eldridges withdrew this theory before the trial court ruled on summary judgment, so we do not address it here.

means" basis for tortious interference liability depended on Johndrow's alleged defamation of the Eldridges, the court granted summary judgment on the tortious interference claims insofar as they were based on improper means.

¶10    However, the district court denied summary judgment on the tortious interference claims insofar as they were based on allegations of improper purpose. Mr. Johndrow had argued that the court should follow the Restatement and hold that the communication of "truthful information," regardless of purpose, cannot constitute tortious interference. RESTATEMENT (SECOND) OF TORTS § 772(a) (1979). But the court relied on our decision in *Pratt v. Prodata, Inc.*, which explicitly rejected the Restatement's truth defense in the context of improper-purpose claims. 885 P.2d 786, 790 (Utah 1994). Correctly concluding that the reconsideration of *Pratt* was a matter for a higher tribunal, the court denied summary judgment with respect to the Eldridges' improper-purpose claims.

¶11    Mr. Johndrow filed an interlocutory appeal, and we reverse.

**STANDARD OF REVIEW**

¶12    Denials of summary judgment are reviewed for correctness. *Glenn v. Reese*, 2009 UT 80, ¶ 6, 225 P.3d 185.

**ANALYSIS**

¶13    The Eldridges' remaining tortious interference claims depend on the allegation that Mr. Johndrow interfered with their economic relations for an improper purpose. This improper-purpose doctrine was adopted in *Leigh Furniture & Carpet Co. v. Isom*: "[I]n order to recover damages [for tortious interference], the plaintiff must prove (1) that the defendant intentionally interfered with the plaintiff's existing or potential economic relations, (2) *for an improper purpose* or by improper means, (3) causing injury to the plaintiff." 657 P.2d 293, 304 (1982) (emphasis added). The *Leigh Furniture* court made clear that "improper purpose (or motive, intent, or objective) will support a cause of action for intentional interference with prospective economic relations even where the defendant's means were proper." *Id.* at 307.

¶14    For reasons we articulate below, *see infra* ¶¶ 42–64, we hereby reject the improper-purpose rule. Contrary to *Leigh Furniture*, we hold that a claim for tortious interference may only succeed where the defendant has employed an improper means.

4

¶15    Before we explain our reasons for rejecting improper purpose liability, we must deal with two obstacles to our rejection of the doctrine. First, we conclude that although the reconsideration of improper purpose liability was not Mr. Johndrow's chief argument on appeal, it is nevertheless properly presented for our consideration. *See infra* ¶¶ 16–19. Second, we conclude that stare decisis does not prevent us from abandoning the improper purpose doctrine. *See infra* ¶¶ 20–41.

## I. RECONSIDERATION OF THE IMPROPER-PURPOSE DOCTRINE IS PROPERLY BEFORE THE COURT

¶16    In *Pratt v. Prodata, Inc.*, we declined to reconsider our support for improper-purpose liability because the parties had not asked us to do so and the question was therefore not properly presented. 885 P.2d 786, 789 n.3 (Utah 1994) (opinion of Zimmerman, C.J.). The same obstacle does not exist in this case.

¶17    Admittedly, Johndrow's first brief did not focus on reconsideration of the improper-purpose doctrine, instead arguing that we should follow the Restatement and declare that truth is an absolute defense to tortious interference liability. *See* RESTATEMENT (SECOND) OF TORTS § 772(a) (1979). It did, however, explain at some length "the difficulties associated with the improper purpose prong" and acknowledged that these difficulties could lead the court to "undertake a complete reconsideration" of it. In particular, it pointed out how "problematic" it is to "permit[] liability for otherwise legal and permissible conduct if the defendant can be said to have acted with 'ill will' towards the plaintiff." Further, it argued that a growing number of states have limited or rejected claims based solely on improper purpose.

¶18    The Eldridges' brief seized on this discussion, accusing Johndrow of demanding the abandonment of improper-purpose liability and offering a full-throated defense of the doctrine: "Essentially, Johndrow asks this Court to reverse itself and impose a black-letter and inflexible standard that would protect extremely malicious conduct . . . . The improper purpose prong as currently utilized and applied by Utah courts strikes a fair and appropriate balance between the interests of the various parties . . . ." Johndrow's reply brief disclaimed that reconsideration of improper-purpose liability was necessary to its case, but it repeated its arguments against the doctrine and expressly invited the court to reconsider it.

¶19    The reconsideration of improper-purpose liability has thus been explicitly raised by the parties and adequately argued in their briefs. We may therefore reach this issue.

## II. STARE DECISIS DOES NOT PRECLUDE RECONSIDERATION OF THE IMPROPER-PURPOSE DOCTRINE

¶20    The Eldridges urge that "[t]he district court's decision should be affirmed because it is mandated by the doctrine of stare decisis." Although the Eldridges are correct that stare decisis required the district court to deny summary judgment,[3] the doctrine does not prevent this court from reconsidering its precedents when it is appropriate to do so.

¶21    Stare decisis "is a cornerstone of Anglo–American jurisprudence" because it "is crucial to the predictability of the law and the fairness of adjudication." *State v. Thurman*, 846 P.2d 1256, 1269 (Utah 1993). Because stare decisis is so important to the predictability and fairness of a common law system, we do not overrule our precedents "lightly." *State v. Hansen*, 734 P.2d 421, 427 (Utah 1986) (plurality opinion).

¶22    However, our presumption against overruling precedent is not equally strong in all cases. *See State v. Menzies*, 889 P.2d 393, 399 (Utah 1994) ("[Stare decisis] is neither mechanical nor rigid as it relates to courts of last resort."); 20 AM. JUR. 2D *Courts* § 131 (2005) ("[T]he principle [that a court should not overrule its own precedents] is not a binding legal rule to be blindly followed . . . ."). Our decisions have identified two broad factors that distinguish between weighty precedents and less weighty ones: (1) the persuasiveness of the authority and reasoning on which the precedent was originally based, and (2) how firmly the precedent has become established in the law since it was handed down. The second factor encompasses a variety of considerations, including the age of the precedent, how well it has worked in practice, its consistency with other legal principles, and the extent to which people's reliance on the precedent would create injustice or hardship if it were overturned.

¶23    As we discuss below, none of the factors that give stare decisis special weight are present here.

---

[3] "Under [stare decisis], lower courts are obliged to follow the holding of a higher court, as well as any 'judicial dicta' that may be announced by the higher court." *State v. Menzies*, 889 P.2d 393, 399 n.3 (Utah 1994).

*A. The Improper-Purpose Doctrine Rests on*
*Weak Authority and Reasoning*

¶24    The first factor in determining how much deference a precedent should be afforded is the persuasiveness of the authority and reasoning on which the precedent is based. *See Laney v. Fairview City*, 2002 UT 79, ¶ 46, 57 P.3d 1007 (plurality opinion) ("[T]he precedent rejected in *Menzies* was established 'with little analysis and without reference to authority.'" (quoting *Menzies*, 889 P.2d at 399)); *accord Montejo v. Louisiana*, 556 U.S. 778, 792–93 (2009) ("[T]he relevant factors in deciding whether to adhere to the principle of *stare decisis* include . . . whether the decision was well reasoned.").

¶25    Here we note first that our cases supporting improper-purpose liability are themselves weak authorities on this issue. We first endorsed the improper-purpose doctrine in *Leigh Furniture & Carpet Co. v. Isom*, but the decision in that case did not actually rely on it. 657 P.2d 293, 308 (Utah 1982) ("[T]he evidence in this case would not support a jury finding [of improper purpose]."). Because *Leigh Furniture* was decided on other grounds, its endorsement of improper-purpose liability was not, in the strictest sense, part of the case's holding. Its precedential weight is therefore limited.[4] *See* 20 AM. JUR. 2D *Courts* § 134 (2014) ("[A] case is not authority for any point not necessary to be passed on to decide the case . . . ."); Arthur L. Goodhart, *Determining the Ratio Decidendi of a Case*, 40 YALE L.J. 161, 161 (1930) ("In order that an opinion may have the weight of a precedent . . . it must be an opinion the formation of which is necessary for the decision of a particular case . . . .").[5]

---

[4] Limited, that is, with respect to this court. *See Menzies*, 889 P.2d at 399 n.3 ("[L]ower courts are obliged to follow . . . any 'judicial dicta' that may be announced by the higher court."); 20 AM. JUR. 2D *Courts* § 134 (2014) ("[D]ictum of a court of last resort can be tantamount to a decision and therefore binding only in the absence of a contrary decision of that court.").

[5] This is not a purely formalist distinction, one without any practical purpose. Rather, it recognizes that when a court announces a rule that is unnecessary to its decision, it is less likely to have considered all the potential arguments against the rule. Had the *Leigh Furniture* court actually attempted to impose liability in the absence of any improper means, it might have been forced to confront the problems inherent in the improper-purpose prong of its test. As it was, the facts of the case did not require the court to confront those problems, and, by and large, it did not confront them.
(continued...)

¶26    The only decision in which we have allowed liability based solely on an improper purpose is *Pratt v. Prodata, Inc.*, which upheld a jury verdict based on improper purpose where the jury had found no improper means. 885 P.2d 786, 788–89 (Utah 1994). *Pratt*, however, is also a weak precedent because it merely assumed that *Leigh Furniture*'s improper-purpose prong was good law, without hearing argument on that issue. *Cf.* 20 AM. JUR. 2D *Courts* § 134 (2014) ("For a case to be stare decisis on a particular point of law, that issue *must have been raised in the action* decided by the court . . . . [A] case is not binding precedent on a point of law where the holding is only . . . assumed in the decision but is not announced." (emphasis added) (footnotes omitted)).

¶27    Further, only two of the four justices who decided *Pratt* actually endorsed improper-purpose liability. *Pratt*, 885 P.2d at 790–91 (Stewart, A.C.J., concurring). The other two expressed "grave doubts about the future vitality of *Leigh*'s improper-purpose prong," but they declined to consider the issue because it was not properly "before the court." *Id.* at 789 n.3 (opinion of Zimmerman, C.J.). That this court split evenly on improper-purpose liability twenty years ago, in a case where the issue had been neither raised nor argued by the parties, does not preclude us from reconsidering it today.

¶28    When we turn from the precedential status of *Leigh Furniture* and *Pratt* to the reasoning and authority on which they were based, we see nothing in either case that would make us hesitate to overrule them. To begin with, *Pratt*'s application of improper-purpose liability was based entirely on *Leigh Furniture*, without any discussion of other authority. *See id.* at 788. As for its reasoning, two of the *Pratt* justices endorsed improper-purpose liability because it allowed courts to reach desirable results where "[i]nfliction of gratuitous harm" might otherwise not be remedied. *Id.* at 791 (Stewart, A.C.J., concurring in the result). The other two worried about the doctrine allowing "wholly legitimate" conduct to be declared tortious by "a jury's unguided exercise of its moral judgment." *Id.* at 789 n.3 (opinion of Zimmerman, C.J.). Because reconsideration of the doctrine was not before the court, neither opinion did the hard work of weighing all the arguments and reaching a reasoned conclusion.

¶29    *Leigh Furniture*'s endorsement of improper-purpose liability rested on more authority, but less reasoning. *Leigh* adopted the improper-purpose prong by adopting Oregon's definition of

_____

[5] (...continued)
*See infra* ¶¶ 29–31.

8

tortious interference. 657 P.2d at 304. Its argument for adopting Oregon's definition was simple and persuasive: the first Restatement put too little burden on plaintiffs making their case, the second Restatement put too much, and Oregon's "middle ground" was the best option available. *Id.*

¶30     But as sound as this reasoning was, it did not explain why improper purpose, in the absence of improper action, should constitute independent grounds for liability. On this crucial point, *Leigh Furniture* was silent. It warned against overuse of the improper-purpose prong. *Id.* at 307 ("[I]t [is] prudent for commercial conduct to be regulated for the most part by the improper means alternative . . . ."). It explained why the improper-purpose prong was problematic. *Id.* (acknowledging "[p]roblems inherent in proving motivation or purpose"). But nowhere did it explain why the improper-purpose prong was necessary at all.

¶31     Its inclusion of improper purpose in its reasoning therefore rested entirely on persuasive authority. *See id.* at 307–08 (citing a treatise and a handful of cases from other jurisdictions). Yet its appeal to authority on this issue was also weak because, as it acknowledged, there was "no generally acknowledged or satisfactory majority position" on the elements of tortious interference. *Id.* at 303–04. Rather, tortious interference law nationwide was "still in a formative stage." *Id.* at 304.

¶32     We do not wish to overstate the matter. *Leigh Furniture* is the seminal case of Utah's tortious interference law, and we would follow even its dicta if we had no good reason to do otherwise. However, on the narrow issue of improper-purpose liability, its authority is weak and its reasoning is nearly nonexistent. It does nothing to quell our concerns about the improper-purpose doctrine.

### B. The Improper-Purpose Doctrine Is Not Firmly Established in Utah Law

¶33     Although our precedents adopting the improper-purpose prong are weak and unpersuasive, we would still hesitate to overrule them if the doctrine had become firmly established in Utah law. But examination of the cases applying *Leigh Furniture* demonstrates that it has not.

### 1. Age and Public Reliance

¶34     In determining how firmly a precedent has established itself in Utah law, we look to a variety of considerations. *Supra* ¶ 22. First, we look to the age of the precedent, since newer precedents are likely to be less firmly established. *See Laney*, 2002 UT 79, ¶ 46

(plurality opinion). The doctrine at issue here was adopted thirty-two years ago in *Leigh Furniture*, without any significant precursors in Utah law. *See Leigh Furniture*, 657 P.2d at 304. While thirty-two years is more than enough time for a precedent to become firmly established if it is regularly used and relied on, we note that unlike the precedent we upheld in *Laney*, improper-purpose liability is not based on a legal principle established in "the earliest days of statehood." *Laney*, 2002 UT 79, ¶ 46 (plurality opinion).

¶35    Second, we consider the extent to which people's reliance on the precedent would create injustice or hardship if it were overturned. As we recently stated in *Cope v. Utah Valley State College*,

> [W]e consider whether overturning a precedent would undermine the public's substantial reliance upon an established legal principle. . . . [P]eople should know what their legal rights are as defined by judicial precedent, and having conducted their affairs in reliance on such rights, ought not to have them swept away by judicial fiat.

2014 UT 53, ¶ 19, ___ P.3d ___ (internal quotation marks omitted); *accord* 20 AM. JUR. 2D *Courts* § 132 (2014) ("[E]ven if the earlier precedent was wrongfully decided, the court will not overrule the precedent where . . . it has remained standing for a significant period and *many have relied on it* . . . ." (emphasis added)).

¶36    When a doctrine has not been necessary to the outcome of many cases, it is unlikely that the public has relied on it in any substantial way. *Cf. Cope*, 2014 UT 53, ¶ 26 ("[When a case] has not become a well-entrenched or frequently applied precedent, the public's reliance upon [the case] is not as strong."). That is certainly the case here.

¶37    This court, the court of appeals, and Utah's federal courts have quoted *Leigh Furniture*'s "improper purpose" language in dozens of tortious interferences cases, but they have found evidence of improper purpose only three times. The first time was in *Pratt*, in which half the Court might have rejected the doctrine entirely if a party had asked it to do so. 885 P.2d at 789 n.3. The second time was *ProMax Development Corp. v. Mattson*, in which the court of appeals affirmed a trial court's finding of improper purpose in circumstances similar to *Pratt*. *ProMax Dev. Corp. v. Mattson*, 943 P.2d 247, 254–55 (Utah Ct. App. 1997). And the third time occurred in 2008, when the federal district court of Utah concluded that there was enough evidence of improper purpose for the issue to go to a jury. *Peterson*

*v. Luna Bronze, L.C.*, No. 2:07CV00054DS, 2008 WL 4130021, at *2 (D. Utah Aug. 14, 2008).

¶38   Far more common are the cases in which courts have rejected allegations of improper purpose. We have analyzed and rejected improper-purpose claims five times,[6] the court of appeals has done so once,[7] and the District of Utah has done so more than half a dozen times.[8] Often the improper-purpose doctrine has not been applied at all, either because parties have declined to raise the issue or because courts have chosen not to consider it.[9] Given the difficulty of winning claims under the improper-purpose doctrine, it would have been foolhardy for people to rely on it in their private dealings.

---

[6] *Keith v. Mountain Resorts Dev.*, LLC, 2014 UT 32, ¶¶ 44–47, 337 P.3d 213 ("Ms. Keith failed as a matter of law to establish improper purpose . . . ."); *Ferguson v. Williams & Hunt, Inc.*, 2009 UT 49, ¶ 42, 221 P.3d 205 ("Protecting the legitimate interests of a firm's client, without evidence of predominating ill will, is not an improper purpose."); *Overstock.com, Inc. v. SmartBargains, Inc.*, 2008 UT 55, ¶¶ 18–19, 192 P.3d 858 ("Overstock has failed to present a material fact that would satisfy the second prong of the *Leigh* test."); *St. Benedict's Dev. Co. v. St. Benedict's Hosp.*, 811 P.2d 194, 201 (Utah 1991) ("The development company has not . . . established that defendants acted with an improper purpose in this case."); *Leigh Furniture*, 657 P.2d at 307–08 ("[W]e must conclude that the evidence in this case would not support a jury finding that the Corporation's predominant purpose was to injure or ruin Isom's business merely for the sake of injury alone.").

[7] *U.P.C., Inc. v. R.O.A. Gen., Inc.*, 1999 UT App 303, ¶¶ 45–49, 990 P.2d 945 ("Garco cannot establish improper purpose . . . .").

[8] *E.g.*, *Soundvision Techs., LLC v. Templeton Grp. Ltd.*, 929 F. Supp. 2d 1174, 1194–95 (D. Utah 2013) ("These reasons are not indicative of a predominate purpose of harming [the plaintiff] as the standards require . . . ."); *Wilcox v. Career Step, LLC*, 929 F. Supp. 2d 1155, 1172 (D. Utah 2013) ("Plaintiff's allegations and evidence are not sufficient to create a disputed issue of fact . . . of an improper purpose . . . .").

[9] *E.g.*, *ClearOne Commc'ns, Inc. v. Chiang*, No. 2:07–CV–37 TC, 2008 WL 3925219, at *3 (D. Utah Aug. 20, 2008) (court did not address improper purpose); *SliceX, Inc. v. Aeroflex Colo. Springs, Inc.*, No. 2:04–CV–615 TS, 2006 WL 1699694, at *2 (D. Utah June 15, 2006) (party alleged only improper means); *CDC Restoration & Constr., LC v. Tradesmen Contractors, LLC*, 2012 UT App 60, ¶ 55, 274 P.3d 317 (party declined to appeal unfavorable improper-purpose ruling).

¶39    The improper-purpose doctrine's vagueness further supports this conclusion. In order to rely on their rights under the improper-purpose doctrine, the Eldridges would have needed to know what those rights were. But as we explain below, knowing one's rights under the improper-purpose doctrine is impossible because the doctrine is so poorly defined. *See infra* ¶¶ 46–54.

2. Other Factors Determining Whether a Precedent is Firmly Established

¶40    We use two more considerations to determine whether a precedent has become firmly established. First, we ask how well it has worked in practice. *Laney*, 2002 UT 79, ¶ 46 (plurality opinion) (citing *Menzies*, 889 P.2d at 400); *see also People v. Hernandez*, 896 N.E.2d 297, 304 (Ill. 2008) ("Good cause to depart from *stare decisis* also exists when governing decisions are unworkable . . . ."). Second, we ask whether the precedent has become inconsistent with other principles of law. *Cf.* 20 AM. JUR. 2D *Courts* § 132 (2005) ("Another formulation of the grounds for deviation from precedent states that the court must consider . . . whether the principles of law have developed to such an extent as to leave the old rule no more than a remnant of abandoned doctrine . . . .").

¶41    These considerations will be addressed in Part III, during our discussion of the merits of the improper-purpose prong. Neither of them, however, will alter the conclusion we reach based on the considerations above. Far from being firmly established, our improper-purpose doctrine has had little influence on litigation in this state.

### III. THE IMPROPER-PURPOSE DOCTRINE SHOULD BE ABANDONED

¶42    If we were convinced that the improper-purpose doctrine served important public purposes, we would uphold it despite its weak basis in precedent. But our conviction is the opposite: improper purpose, in the absence of any improper means, should not be a basis for tortious interference liability.

¶43    As our decisions have recognized, determining the predominant purpose behind a defendant's actions raises significant evidentiary problems. Because this inquiry is necessarily fact-intensive, appellate review has been limited, and little case law has developed to guide courts' and juries' work. The improper-purpose doctrine thus requires trial courts and juries to make decisions that are effectively without guidance.

¶44 This vagueness does more than lead to unpredictable verdicts. It also fails to give parties adequate notice of their rights and duties. If improper-purpose liability became commonplace, it would have a chilling effect on legitimate, socially beneficial competitive practices. Worse, it would chill speech, discouraging the free spread of information and opinion.

¶45 For these reasons, among others, other states have increasingly limited or rejected improper-purpose liability. In addition to supporting our arguments against improper-purpose liability, this trend further weakens the authority on which *Leigh Furniture* was based. With both contemporary authority and our own reasoning opposed to improper-purpose liability, we conclude that it should be rejected.

*A. The Improper-Purpose Doctrine Provides
Too Little Guidance for Courts and Juries*

¶46 Anger and even malice are commonplace human emotions, and it would be neither possible nor desirable to treat every angry or malicious action as a tort. Even a tort allowing liability whenever a defendant maliciously interfered with a plaintiff's economic relations would be unwise. As *Leigh Furniture* recognized, such a tort would interfere with "much competitive commercial activity, such as a businessman's efforts to forestall a competitor in order to further his own long-range economic interests." *Leigh Furniture & Carpet Co. v. Isom*, 657 P.2d 293, 307 (Utah 1982).

¶47 *Leigh Furniture* sought to foreclose this possibility by requiring plaintiffs to show not merely that an improper purpose was present, but that it predominated over legitimate motivations. *Id.* ("[The improper-purpose doctrine] takes the long view of the defendant's conduct, allowing objectionable short-run purposes to be eclipsed by legitimate long-range economic motivation."). Yet even so, it recognized that there were "[p]roblems inherent in proving motivation or purpose" and cautioned against overuse of the improper-purpose prong. *Id.*

¶48 In *Pratt v. Prodata, Inc.*, Chief Justice Zimmerman argued that *Leigh Furniture*'s efforts to limit the improper-purpose prong were inadequate. 885 P.2d 786, 789 n.3 (Utah 1994) (opinion of Zimmerman, C.J.). Under *Leigh Furniture*'s predominant-purpose standard, "all relevant considerations are issues of fact," and "improper-purpose findings" are therefore "insulate[d] . . . from meaningful appellate review." *Id.* Consequently, once a plaintiff presents evidence of an improper purpose, no legal standard exists to guide fact-finders' determination of whether that purpose or the

defendant's legitimate purposes predominated. Juries are required to look into the defendant's soul and discern which of her mixed motives was the real cause of her action—a question she herself, at the time she acted, may not have been able to answer with any certainty.

¶49    The three Utah cases that have allowed improper-purpose claims demonstrate the perceptiveness of Chief Justice Zimmerman's critique.[10] In each case, the question of improper purpose reached the court in a procedural posture that permitted only minimal scrutiny.[11] In each case, there was clearly evidence to support a finding of a legitimate purpose.[12] And yet in each case, the court concluded that weighing the evidence of a proper purpose against

[10] These cases are *Pratt*, 885 P.2d 786; *ProMax Development Corp. v. Mattson*, 943 P.2d 247 (Utah Ct. App. 1997); and *Peterson v. Luna Bronze, L.C.*, No. 2:07CV00054DS, 2008 WL 4130021, at *2 (D. Utah Aug. 14, 2008).

[11] *Pratt* and *ProMax* both involved challenges to a factual finding of improper purpose, and therefore reviewed only the sufficiency of the evidence. *Pratt*, 885 P.2d at 789 ("There is substantial credible evidence in the record to support the jury's determination that defendants interfered with Pratt's economic relations for an improper purpose . . . ."); *ProMax*, 943 P.2d at 252 ("[D]oes the evidence support the trial court's factual findings and legal conclusions . . . ?"). In *Luna Bronze*, the federal district court denied summary judgment against an improper-purpose claim, concluding there was sufficient evidence for a jury to find an improper purpose. 2008 WL 4130021, at *1–*2 ("The Court is of the view that a reasonable jury could conclude from the evidence cited by Luna Bronze that Peterson's purpose was improper.").

[12] In all three cases, a jury could have concluded that the defendants' action was intended to protect their legal rights and economic interests. *Pratt* arose out of an employer's efforts to enforce a non-compete agreement, though the means the employer used to enforce the agreement were unconventional and possibly unethical. 885 P.2d at 789 ("Rather than suing Pratt for breach of the Noncompete Covenant as it was legally entitled to do, Prodata utilized its contacts at [Pratt's employer] to have Pratt fired."). In *ProMax*, the defendant claimed he had a contractual right "to act as [the] selling agent" for a home and took steps to prevent the home's sale without his involvement. 943 P.2d at 251. And in *Luna Bronze*, the defendant's allegedly tortious action was to send out cease-and-desist letters during a copyright dispute. 2008 WL 4130021, at *1.

the evidence of an improper purpose was a task for the finder of fact.[13]

¶50    Were the approach of these cases followed in large numbers of cases, *Leigh Furniture*'s efforts to limit the scope of the improper-purpose doctrine would be futile; any significant evidence of improper purpose would allow juries to find even the most commonplace commercial conduct tortious, no matter how much evidence could be presented of legitimate motivations.[14] The outcome of improper-purpose claims would thus depend more on jurors' personal sympathies for one party or the other than on any generally applied legal rule.

### B. The Improper-Purpose Doctrine Gives Parties Inadequate Notice of Their Rights and Duties

¶51    Because improper-purpose findings are so dependent on fact-finders' personal sympathies, and so insulated from appellate review, the outcome of an improper-purpose suit becomes unpredictable as soon as any evidence of improper purpose is introduced. This is a problem not merely because it may lead to unjust outcomes in individual cases, but because it makes it impossible for private parties to understand their rights and duties under tortious interference law.

¶52    Under the improper-purpose prong as it has developed, a business owner could be sued for undercutting his competitor's prices if he held a grudge against her. An investor in a Ponzi scheme

---

[13] *Pratt*, 885 P.2d at 788–89 (expressing deference to the jury's finding of improper purpose); *ProMax*, 943 P.2d at 255 ("[T]here was sufficient evidence presented at trial from which the trial court could have [found improper purpose]."); *Luna Bronze*, 2008 WL 4130021, at *2 ("The evidence, thus, presents sufficient disagreement to require submission to a jury.").

[14] The *ProMax* and *Luna Bronze* courts each cited only a single piece of evidence suggesting an improper purpose. In *ProMax*, the court mentioned only that the defendant could have sued to protect his contractual rights but chose not to. 943 P.2d at 255. In *Luna Bronze*, the court cited only testimony that the defendant had warned the plaintiff that their copyright dispute would cause "the owner of Luna Bronze to lose the business to Peterson and to be deported." 2008 WL 4130021, at *2. And yet each court concluded that a single piece of ambiguous evidence was sufficient to support a finding of improper purpose. *ProMax*, 943 P.2d at 255; *Luna Bronze*, 2008 WL 4130021, at *2.

might be sued for exposing the scheme if she did so with enough malice towards her swindlers. And a customer leaving angry reviews online might receive a response to her complaints via service of process.

¶53   It is of course likely that few juries would find a predominantly improper purpose in any of these cases, but that is beside the point. The mere risk that a jury might find liability, coupled with the low bar the claims need to clear in order to reach a jury in the first place, could become a substantial deterrent to socially beneficial speech and conduct if improper-purpose suits became common.[15] In the First Amendment context, the tendency of a law to deter conduct it does not actually prohibit is known as a chilling effect, and is sometimes sufficient to invalidate the law as an infringement of the freedom of speech even when the object of the law is constitutionally unobjectionable. *See* Frederick Schauer, *Fear, Risk and the First Amendment: Unraveling the "Chilling Effect,"* 58 B.U. L. REV. 685, 693 (1978).

¶54   We do not hold that the improper-purpose doctrine actually violates the First Amendment—that question is not before us, and we have no need to reach it. But we are persuaded that the improper-purpose doctrine as it currently exists in Utah is in tension with First Amendment principles, and this tension is a further reason to abandon the precedent on which it is based.

### C. The Pratt Dissenters' Concerns Are Adequately Addressed by the Improper Means Prong

¶55   Though the foregoing discussion demonstrates the disadvantages of improper-purpose liability, it does not weigh those costs against the doctrine's benefits—benefits sufficient to persuade two justices of the *Pratt* court that the improper-purpose prong

---

[15] The Seventh Circuit recognized this problem in a tortious interference case brought under Illinois law. In rejecting an argument that "[a] competitor's privilege does not include a right to get business from a competitor by means of fraud," the court pointed out that "[o]nce a case gets to the jury, all bets are off. The practical consequence of [this] approach, therefore, would be that a sports agent who lured away the client of another agent with a promise to do better by him would be running a grave legal risk." *Speakers of Sport, Inc. v. ProServ, Inc.*, 178 F.3d 862, 865–66 (7th Cir. 1999).

should be retained despite its dangers. 885 P.2d at 790–91 (Stewart, A.C.J., concurring in the result).[16]

¶56 Specifically, two of the *Pratt* justices argued that although "[the improper-purpose] prong, if construed broadly, could seriously interfere with the forces of competition in the marketplace," the doctrine was nevertheless "sound[]." *Id.* Without an improper-purpose prong, they argued, "[i]nfliction of gratuitous harm" might go unremedied. *Id.* at 790–91. Because of the need for a remedy in cases like *Pratt*, the two justices preferred to deal with the improper-purpose prong's problems by letting the doctrine mature and narrow itself through the normal processes of common-law adjudication. *Id.* ("It is, indeed, the strength of the common law that general principles of law receive definition *and limitation* over time by their application in specific fact situations." (emphasis added)).

¶57 We agree with Justice Stewart's *Pratt* concurrence that tortious interference law needs flexibility to deal with the new and creative methods people might invent to inflict gratuitous economic harm on each other. But we disagree that improper-purpose liability is the best way to maintain this flexibility. As we explained above, because of the improper-purpose rule's highly fact-dependent character, the doctrine hinders rather than promotes case-by-case efforts to adapt the common law to solve contemporary problems. *Supra* ¶¶ 46–50. Further, the improper-purpose prong's emphasis on defendants' motivations, rather than their actions, prevents courts from articulating clear distinctions between appropriate conduct and conduct that "ought not to be acceptable under the law." *Pratt*, 885 P.2d at 791 (Stewart, A.C.J., concurring in the result).

¶58 The better approach is to encourage further development of the improper-means prong. As Justice Stewart's concurrence recognized, "*Leigh Furniture* did not, and could not, deal with every possible fact situation to which the principles enunciated therein might be applied." *Id.* at 790. Neither has our improper-means jurisprudence since *Leigh Furniture* set precise boundaries that will prevent courts from recognizing new sorts of improper means when they arise.

---

[16] These two justices included the author of this opinion, who can now only echo Baron Bramwell: "The matter does not appear to me now as it appears to have appeared to me then." *Andrews v. Styrap*, (1872) 26 L.T. 704 (Exch.) 706 (Bramwell, B.) (Eng.).

¶59    Further development of the improper-means prong is therefore possible, and it has a great advantage over developing the improper-purpose prong. Unlike findings of improper purpose, findings of improper means will not depend solely on defendants' state of mind. They will thus allow for more careful appellate review, leading to a better defined and more predictable tortious interference jurisprudence.

*D. Other Jurisdictions Have Increasingly Limited or Rejected Improper-Purpose Liability*

¶60    Finally, we observe that we are not alone in determining that improper-purpose liability does more harm than good. In the context of intentional interference with prospective economic relations, one prominent treatise acknowledges "a definite movement toward limiting or even eliminating motive-based liability." 3 DAN B. DOBBS ET AL., THE LAW OF TORTS § 639 (2d ed. 2011). This movement is not so great as to be irresistible, and much of it depends on a distinction drawn in other states between interference with prospective economic relations and interference with contract.[17]

¶61    Nevertheless, in recent decades a number of courts have concluded that tortious interference liability should result from wrongful conduct rather than mere malice. *See, e.g.*, *Avilla v. Newport Grand Jai Alai LLC*, 935 A.2d 91, 99 (R.I. 2007) ("We do not believe a searching analysis only of motive is in most instances enough to send these cases to the jury. There must still . . . be something 'illegal' about the means employed." (alteration in original)). Some cases have concluded that an improper purpose is sufficient grounds for tortious interference liability only when there is no other reason for the defendant's conduct. *E.g.*, *Carvel Corp. v. Noonan*, 818 N.E.2d 1100, 1103 (N.Y. 2004) ("[Tortious interference liability] has been recognized where a defendant engages in conduct for the *sole* purpose of inflicting intentional harm on plaintiffs . . . ." (emphasis added) (internal quotation marks omitted)). Other cases have gone as far as we go here, for similar reasons, and rejected improper purpose liability entirely. *E.g.*, *Wal-Mart Stores, Inc. v. Sturges*, 52 S.W.3d 711, 726 (Tex. 2001) ("We . . . hold that to recover for tortious interference with a prospective business relation a plaintiff must prove that the defendant's *conduct* was independently tortious or

---

[17] *See, e.g.*, *Wal-Mart Stores, Inc. v. Sturges*, 52 S.W.3d 711, 727 (Tex. 2001) ("In [concluding that tortious interference requires wrongful conduct] we treat tortious interference with prospective business relations differently than tortious interference with contract.").

wrongful. . . . The concepts of malice [and] justification [i.e., intent] . . . provide no meaningful description of culpable conduct . . . ." (emphasis added)).

¶62 Again, the trend on this point is not irresistible. But we are persuaded that our holding accords with the reasoned judgment of other jurisdictions that have considered the question.

*E. Summary*

¶63 The improper-purpose doctrine, as it has been articulated in *Leigh Furniture* and *Pratt*, has not been successfully restricted within the narrow limits envisioned by *Leigh*. Rather, it has required fact-finders to look into defendants' souls whenever any evidence of improper purpose could be presented. We now conclude that if the doctrine came into common use, it would deter socially beneficial speech and conduct, and other courts have increasingly sought to solve this problem by restricting or abandoning improper-purpose liability.

¶64 We therefore conclude that the improper-purpose doctrine has not worked well in practice, and that "more good than harm will come by departing from precedent." *State v. Menzies*, 889 P.2d 393, 399 (Utah 1994). It should therefore be abandoned.

## IV. CONSIDERATION OF A DEFENDANT'S PURPOSE REMAINS APPROPRIATE IN SOME CIRCUMSTANCES

¶65 Although we reject our past doctrine that improper purpose is sufficient grounds for tortious interference liability, this does not mean that defendants' motives and intent are entirely irrelevant to tortious interference claims. We wish to make clear that defendants' motivation is still relevant to tortious interference claims in two ways.

¶66 First and more obviously, tortious interference remains an intentional tort. *Leigh Furniture & Carpet Co. v. Isom*, 657 P.2d 293, 304 (Utah 1982) ("[I]n order to recover damages, the plaintiff must prove (1) that the defendant *intentionally* interfered with the plaintiff's existing or potential economic relations . . . ." (emphasis added)). Intent and motive are not synonymous; in the tort context, "intent" means a desire to bring about certain consequences, not a person's reasons for that desire. *See* RESTATEMENT (SECOND) OF TORTS § 8A (1965) ("The word 'intent' is used throughout the Restatement of this Subject to denote that the actor desires to cause consequences of his act . . . ."). Nevertheless, evidence of defendants' motives will frequently shed light on their intent.

¶67    Second, defendants' motivation will often be relevant to the improper means prong of the *Leigh Furniture* test. For example, a plaintiff might bring a tortious interference suit alleging that the defendant's improper means of interference was an abuse of judicial process. *See* 3 DAN B. DOBBS, THE LAW OF TORTS § 617 (2d ed. 2011) (listing abuse of process as a tort on which a tortious interference claim might be based). In order to adjudicate that claim, a court would have to determine whether the defendant used a legal process "primarily *to accomplish a purpose* for which it is not designed." *Gilbert v. Ince*, 1999 UT 65, ¶ 17, 981 P.2d 841 (emphasis added) (internal quotation marks omitted). This is only one of many possible claims in which the propriety of a particular means will depend in part on the defendant's reasons for employing it.

¶68    In such cases, however, it will never be the defendant's motivation by itself that leads to liability. Abuse of process is an improper means not because the defendant bore the plaintiff ill will; it is an improper means because those who avail themselves of the legal system's coercive powers have a duty to do so for legitimate legal reasons. A person who violates this duty, with the intent to hinder someone's economic relations, is liable for whatever damages result from that improper act.

¶69    On the other hand, a person who violates no legal duties, infringes no one's rights, and commits no wrongful action can never be held liable for malice alone.

## CONCLUSION

¶70    For the foregoing reasons, we conclude that in the absence of any improper means, an improper purpose is not grounds for tortious interference liability. We therefore overrule *Pratt v. Prodata*, 885 P.2d 786 (Utah 1994). We also disavow all dicta in *Leigh Furniture & Carpet Co. v. Isom*, 657 P.2d 293 (Utah 1982), that would allow liability based solely on an improper purpose. In order to win a tortious interference claim under Utah law, a plaintiff must now prove "(1) that the defendant intentionally interfered with the plaintiff's existing or potential economic relations, (2) . . . by improper means, (3) causing injury to the plaintiff."*Id.* at 304.

¶71    The Eldridges' tortious interference claims fail the second prong of this test: they have failed to produce evidence of an improper means. The district court's denial of summary judgment on the tortious interference claims is therefore reversed, and the matter is remanded for further action consistent with this opinion.

_____