2025 UT App 16

## THE UTAH COURT OF APPEALS

HOLLY WINN AND STEVE WINN,
Appellants,
*v.*
RODRICK D. MCKINLAY AND
ROCKY MOUNTAIN ASSOCIATED PHYSICIANS,
Appellees.

Opinion
No. 20221016-CA
Filed February 6, 2025

Third District Court, Salt Lake Department
The Honorable Laura Scott
No. 170902137

G. Eric Nielson and Todd Wahlquist,
Attorneys for Appellants

Troy L. Booher, Beth E. Kennedy, Lashel Shaw,
Stuart H. Schultz, Michael J. Miller, and Karmen
Schmid, Attorneys for Appellees

JUDGE JOHN D. LUTHY authored this Opinion, in which
JUDGES DAVID N. MORTENSEN and RYAN D. TENNEY concurred.

LUTHY, Judge:

¶1 Dr. Rodrick D. McKinlay performed bariatric surgery on Holly Winn, who subsequently suffered a pulmonary embolism. Holly and her husband (the Winns) sued McKinlay and Rocky Mountain Associated Physicians (Rocky Mountain) for negligence. During his deposition and in a response to a request for admission, McKinlay stated that a recommendation from Holly's pulmonologist (Pulmonologist) for Holly to be prescribed anticoagulants following surgery had been placed in Holly's insurance file rather than in her separate patient file and that McKinlay had not, therefore, seen the recommendation before

performing Holly's surgery. At trial, however, McKinlay testified to a different set of facts, saying instead that for each patient, Rocky Mountain maintained a patient file containing all of the patient's documents and that, per his custom and practice, he would have looked through Holly's patient file and seen the recommendation before surgery. The jury ultimately rejected the Winns' claims and found in favor of McKinlay and Rocky Mountain (collectively, Defendants).

¶2 The Winns moved for a new trial, arguing that Defendants' counsel had orchestrated McKinlay's change in testimony and that this constituted grounds for a new trial under rule 59 of the Utah Rules of Civil Procedure. The district court agreed that Defendants' actions constituted an irregularity and a surprise under rule 59, but it found that the Winns were not prejudiced by the conduct, so it denied the Winns' motion. The Winns now appeal, contending that they were prejudiced because if they had been informed before trial that McKinlay planned to change his testimony, they would have brought an informed consent claim and likely received a verdict in their favor. Because this argument was not presented to the district court, we conclude that it is unpreserved.

¶3 The Winns also assert that the district court improperly denied them the opportunity to cross-examine McKinlay about the deaths of two of his prior patients that had been caused by pulmonary embolisms. However, because the Winns never asked the court to permit such questioning, the court did not commit the asserted error. Accordingly, we affirm.

BACKGROUND

*The Surgery and Pulmonary Embolism*

¶4 In 2015, Holly decided to have bariatric surgery performed by McKinlay. Previously, Holly had developed a pulmonary

embolism after having knee surgery. Accordingly, she met with Pulmonologist in April 2015 to discuss risks and possible treatment related to the bariatric surgery. Pulmonologist recommended that, among other things, Holly be prescribed anticoagulation medication after the surgery for a term of one to two weeks. Pulmonologist gave Holly a copy of this recommendation, and his office sent a copy to McKinlay's clinic, Rocky Mountain.

¶5    In August 2015, McKinlay performed bariatric surgery on Holly and did not prescribe anticoagulants upon her discharge. Thirteen days after the surgery, Holly was rushed to the hospital by paramedics and did not have a pulse for approximately seven minutes. It was determined that she had suffered a pulmonary embolism. Holly has experienced lasting mental deficits because of this episode, and she has not been able to drive, work, or live independently.

*The Winns' Suit*

¶6    The Winns sued Defendants, claiming negligence and alleging, among other things, that Defendants had "[f]ailed to properly evaluate [Holly's] condition prior to discharge" and "[f]ailed to treat [her] with proper anticoagulation [medication] after discharge."

*Discovery*

¶7    The Winns deposed McKinlay in October 2017. During the deposition, McKinlay testified that he "didn't see Pulmonologist's recommendation at the time of [Holly's] surgery." He explained,

> [W]e receive a lot of documentation from physicians
> that are in support of a patient undergoing the
> operation, and they go into an insurance file to then
> allow the patient to go forward with the surgery. . . .

> I didn't have access to his recommendations at the
> time that I saw her.

He stated that there were two different files—an insurance file, which he did not typically look at, and a patient file—and responded to the question, "[I]t's your testimony that Pulmonologist's recommendation never went into the patient file, correct?" with, "Correct." He also declared that if he had seen Pulmonologist's recommendation, he "would have probably called [Pulmonologist] to talk about it and discussed [his own] concerns about bleeding and [Pulmonologist's] concerns about clot."

¶8      The Winns later amended their complaint to add another allegation of negligence—this one solely against Rocky Mountain—based on McKinlay's deposition testimony "mak[ing] clear that [Pulmonologist] gave a copy of his recommendation to [Rocky Mountain] and that an employee negligently filed the recommendation in an insurance file instead of in [Holly's] medical record."

¶9      In June 2018, the Winns served requests for admission on McKinlay. Request for Admission No. 3 stated, "Admit that prior to [Holly's] surgical procedure on August 14, 2015, you personally received a copy of [Pulmonologist's] recommendation regarding perioperative anticoagulation . . . ." McKinlay denied this request.

¶10      The Winns also deposed a Rocky Mountain staff member who confirmed that the office kept "an insurance file that [was] separate from the medical record." The Winns prepared for trial assuming this version of the facts.

*Motions in Limine*

¶11      In September 2021, Defendants filed a motion in limine seeking exclusion of, among other things, evidence related to

"other lawsuits or events involving" Defendants. The Winns responded by saying,

> [The Winns] acknowledge that evidence of prior lawsuits or similar events [is] not generally admissible to show breach of [the standard of] care. Nonetheless, [the Winns] reserve the right to introduce evidence of Defendants' prior lawsuits or other acts if Defendants open the door by implying that [they] are widely respected, always careful, or otherwise attempt to bolster [their] image.

The court granted the motion in limine as to evidence of other lawsuits or events, but it stated, "Nonetheless, the [c]ourt recognizes that evidence of this nature may become admissible if the trial proceeds in a manner that opens the door to this evidence."

¶12 The same month, the Winns filed their own motion in limine, this one seeking to exclude "evidence of the consent for surgery form and discussions with [the Winns] regarding the risks of the procedure." The Winns argued that they had not brought a lack of informed consent claim and that evidence of this nature was irrelevant to the elements of their negligence claims. The court granted this motion.

*Defendants' Asserted Discovery Prior to Trial of Evidence That Conflicted with Their Pretrial Disclosures*

¶13 "[T]en days before trial, on October 26, 2021," Defendants assert on appeal, their trial counsel[1] "physically inspected [Rocky Mountain's] filing systems . . . and discovered [that Pulmonologist's] note was [actually] in the main [patient] file."

---

1. Not all of Defendants' appellate attorneys represented Defendants at trial. Michael J. Miller and Karmen Schmid were Defendants' trial counsel.

Defendants explain that their trial counsel then "discussed the matter with [McKinlay]" and that "[a]s a result, [McKinlay] learned that [Pulmonologist's] note would likely have been included in the hard copy file he typically reviewed in preparation for surgery." According to Defendants, their trial "[c]ounsel discussed with [McKinlay] the importance of correcting his testimony at trial, and his legal and moral obligation to testify truthfully." Defendants did not, however, inform the Winns or the court of this asserted discovery or of their intent to present evidence at trial that contradicted the evidence they disclosed during discovery.

*McKinlay's Testimony at Trial*

¶14 The trial began on November 5, 2021, and was conducted over twelve days between November 5 and November 23. On the second day of trial, the Winns called McKinlay to testify. The following exchange regarding Pulmonologist's recommendation took place between McKinlay and counsel for the Winns:

> Q. Who is responsible for the fact that you didn't review [Pulmonologist's recommendation] before the surgery?
>
> A. I don't have an independent recollection of reviewing this note, but I think it's likely that I would have reviewed it to say that she was cleared for bariatric surgery.
>
> Q. Doctor, you have—you didn't read this note before the surgery, did you?
>
> A. I did not have an independent recollection of reading this note.
>
> Q. Does that mean you read it or you didn't read it?

A. That's what I don't remember. I know that it's my custom and practice to review all the files that are in the chart that are put in front of me when I go to talk to the patient. So given that it is my custom and practice, it's likely that I at least reviewed it, but I don't have an independent recollection of reading it.

Q. Is that what you told me in your deposition?

A. I told you that I didn't read it because I did not have a recollection of having read it.

Q. Forgive me, Doctor. I'm going to take your deposition out of my brief case. It's your testimony that you think you looked at this recommendation or you can't remember?

A. I can't remember, but based on my custom and practice, it's likely that I would have reviewed it.

The Winns' counsel then pressed the point, asking McKinlay, "You didn't say to me four years ago that you ordinarily would have looked at it and that it would have been your custom and practice to look at it. That's not what you said four years ago; correct?" McKinlay conceded, "It's not what I said four years ago."

¶15   After additional questioning regarding the difference between his deposition testimony and his testimony at trial and whether he had seen Pulmonologist's recommendation before the surgery, McKinlay further acknowledged that at the time of trial he did not have "an independent recollection" of having seen the recommendation. And when asked if "it would be pure speculation" for him to assume that he saw the recommendation, McKinlay replied, "Yes."

¶16 The Winns' counsel also asked, "Did you ever . . . call [Pulmonologist] to ask him what he meant by his recommendation to give blood thinners until the patient was one hundred percent ambulatory (likely 7 to 14 days)?" McKinlay responded, "I made my decision on how to treat Holly based on my interview with her, my discussion with her. And, no, I didn't call [Pulmonologist] about that." The Winns' counsel then asked McKinlay the following question, or one similar to it, several times: "[I]t would be fair to say, sir, that if you [had] told Holly that you weren't going to follow the recommendation of the pulmonologist, Holly would have had a couple of choices; correct? Number one, get a different surgeon." McKinlay responded to these questions by saying that he "[thought] Holly always [had] choices" and that "[s]he [was] always free to seek a different surgeon." When the Winns' counsel again asked a similar question, the court called the attorneys to a sidebar and said:

> I'm really concerned about this line of questioning given the ruling that I . . . made on the informed consent. . . . This was not an informed consent case. This line of questioning is making it sound like it's an informed consent case if [information was] not provided which would have impacted her choice of proceeding with the surgery[] [or] proceeding with the different surgeon[.] [A]nd you're welcome to continue. I just want to be very clear [that] if it starts to look like an informed consent issue, then there may be a revisiting of my ruling upon the informed consent.

The Winns' counsel then said he would reorient his questions.

¶17 Defendants' attorney later asked McKinlay, "[A]t the time of discharge, what is your decision-making at that point for Holly

. . . whether to send her home with blood thinners or not? Is there a decision you make there?" McKinlay responded,

> Yes. There's a decision that using the regimen based on my clinical experience with patients like Holly and many others who have undergone this surgery that the regimen that we use . . . does significantly reduce risk and is indicated to help them reduce the risk of pulmonary embolism and that I don't choose them to add risk by putting people on blood thinners after the time of surgery.

Defendants' counsel followed up by asking, "Why? What's the purpose of this? Why do you do it this way?" McKinlay responded, "So a lot does have to do with experience . . . . [A]nd so having seen other patients bleed after discharge . . . , I felt it was in her best interest [to] not prescribe blood thinners."

*Trial Testimony About Other Deaths*

¶18 One of the Winns' experts (Expert)—a bariatric surgeon—later testified. On cross-examination, Defendants' counsel engaged in the following exchange with Expert:

> Q. And you're saying the risk of a [deep vein thrombosis[2]] is more important than the risk of bleeding; is that right?

---

2. "Deep vein thrombosis . . . occurs when a blood clot (thrombus) forms in one or more of the deep veins in the body, usually in the legs." *Deep vein thrombosis (DVT)*, Mayo Clinic, https://www.mayoclinic.org/diseases-conditions/deep-vein-thrombosis/symptoms-causes/syc-20352557 [https://perma.cc/YY2V-M7TB]. Such clots "can break loose" and "travel through the bloodstream and get stuck in the lungs, blocking blood flow (pulmonary embolism)." *Id.*

A. In Holly Winn's case for sure.

Q. And—but the risk of bleeding is not zero. You have established that; correct?

A. Right.

Q. So if she had bled to death, for example, from postoperative bleeding, then that's not a breach of the standard of care . . . ?

A. Well, again, that's extremely unlikely as I mentioned before with bleeding. It's very rare that that results in a fatal event. I believe in his deposition [McKinlay] says he's never had any deaths due to bleeding but actually has had two deaths due to blood clots, so that illustrates a point that we have—

Defendants' counsel then objected, telling the court in a sidebar that Expert's reference to McKinlay having two prior patients who died due to blood clots was "grounds for a mistrial." The Winns' counsel responded that "McKinlay opened the door to that by talking about his own experience." The court said that it would address Defendants' request for a mistrial after they "finish[ed] up for [the day]," and it advised the Winns' counsel to caution Expert to "only answer questions that are being asked."

¶19 The next day, Defendants filed a written motion for a mistrial, and the court heard oral argument on the motion. Defendants' counsel asserted that McKinlay would be prejudiced by the testimony. Counsel for the Winns, on the other hand, argued against a mistrial, contending,

It was [McKinlay] who put the evidence in that he considered other patients he had, who had bled after being discharged, and that's why he didn't put

her on [a] blood thinner. So for [Expert] to then come in and say, well, he's also had people die from [pulmonary embolisms], in the context of analyzing that risk, the door had been opened.

The court denied the motion for a mistrial and said,

I'm not saying the door is open that then allows the [Winns] to continue along these lines of question, but I recognize that with [Expert] it was not a question elicited by counsel for the [Winns]. In fact, it was in response to [Defendants'] question, and there were certainly several times when [Expert] went beyond and volunteered information.

¶20   When McKinlay testified a week later in Defendants' case-in-chief, the Winns did not attempt to question him about his having had surgery patients die due to pulmonary embolisms.

*The Jury's Verdict*

¶21   Ultimately, the jury found that McKinlay had not breached the standard of care applicable to bariatric surgeons. And while it did find that Rocky Mountain had "breached the standard of care applicable to a medical clinic," it determined that Holly had not proved that Rocky Mountain's breach caused her any harm.

*The Winns' Motion for a New Trial*

¶22   The court entered judgment on the jury's verdict in March 2022. In April 2022, the Winns filed a motion for a new trial under rule 59 of the Utah Rules of Civil Procedure, specifically arguing that the district court should grant a new trial due to "irregularity in the proceedings . . . by which a party was prevented from having a fair trial" and "accident or surprise that ordinary prudence could not have guarded against." Utah R. Civ. P. 59(a)(1), (3). The Winns identified as irregularities or surprises

(1) the discrepancy between McKinlay's trial testimony and the version of facts he supplied during discovery and (2) "[t]he [c]ourt's ruling that barred [the Winns] from presenting evidence of McKinlay's personal history of two prior patients that had died as the result of pulmonary embolism[s]." The Winns argued that McKinlay's change in testimony amounted to an ambush and that McKinlay had violated his obligation under the Utah Rules of Civil Procedure to supplement his discovery responses. The Winns asserted that the change was not harmless because if they had been informed ahead of time of McKinlay's "second version" of events, they would have conducted "half a dozen additional depositions" to determine whether any of McKinlay's staff had ever seen him "read a patient's entire paper file before surgery." As to the evidence of McKinlay's other patients who died from pulmonary embolisms, the Winns contended that "[b]ecause the [c]ourt determined that [McKinlay's] testimony had not opened the door to allow [them] to question [McKinlay] about his personal experience with two prior deaths caused by pulmonary embolism[s], [they] were unable to effectively discredit [McKinlay's] testimony that he personally believed the risk of bleeding was greater than the risk of a pulmonary embolism." The Winns argued that they should have been able to cross-examine McKinlay about the deaths related to pulmonary embolisms.

¶23    The court denied the motion for a new trial. It stated its agreement with the Winns that (1) McKinlay made it clear during discovery that there were two separate files for each patient, one of which McKinlay had not seen prior to the surgery, and (2) "McKinlay and his counsel entered the courtroom on the first day of trial fully prepared to present the jury with an entirely new version of facts," specifically, that all of a patient's records were kept in a single hard-copy file that McKinlay routinely reviewed before surgery. The court noted that "[u]nfortunately, it is not that unusual for a witness to change his testimony at trial" but that what was "irregular in this case [was] the apparent active involvement of counsel in that . . . change in testimony." The court

further indicated that "[o]nce [McKinlay] 'realized' that [he] must have personally reviewed [Pulmonologist's] recommendation because it was in the 'hard copy paper file,' he had an absolute duty to supplement Response to Request No. 3" under rule 26 of the Utah Rules of Civil Procedure. The court then continued, "And while his obligation to correct his deposition testimony may be less clear, [McKinlay's] failure to take any steps to notify [the Winns about the change] . . . looks an awful lot like an attempted trial by ambush that the disclosure rules are designed to prevent." Accordingly, the court found both irregularity and surprise under rule 59(a).[3]

---

3. The court further noted that counsel for Defendants "also may have breached their obligations under rule 3.3(b) of the Utah Rules of Professional Conduct," saying,

> [T]he court shares [the Winns'] concerns that [McKinlay's] counsel may have either (1) learned that [McKinlay's] testimony under oath during his deposition was not true but ignored their obligation to amend Response to Request No. 3 and "take remedial measures" under rule 3.3(b); or (2) knowingly assisted [McKinlay] in providing false testimony at trial in violation of rule 3.3(b).

The court stated that it could not "simply ignore the ethical implications of what may have happened in this case." Therefore, based on its "obligation to meaningfully address abuses of the discovery process," the court determined that "a sanction may be appropriate," such as "a monetary sanction in the form of an order declining to award [McKinlay] certain costs that are otherwise recoverable." Accordingly, after the court denied the Winns' motion for a new trial, the Winns filed a motion asking "that the [c]ourt sanction [McKinlay] and his counsel by ordering them to return the costs that were previously awarded to them in this matter." And the court granted this motion.

¶24    But the court did not end its analysis there. It stated that "[i]t is not enough . . . for [the Winns] to show there was [a] 'problem' with the trial in the form of an irregularity or surprise" but that "[t]he court must also determine that this 'irregularity' or 'surprise' prevented [the Winns] from having a fair trial." The court then said, "After carefully considering the entirety of the trial . . . , the court concludes that these problems are not significant enough to warrant a new trial."

¶25    It explained,

> [The Winns] learned about [McKinlay's] new version of events on the *second* day of trial[,] when he testified. Despite their surprise, [the Winns] were able to effectively cross examine [McKinlay] and employ his inconsistent testimony to their full advantage. Indeed, under skillful questioning by counsel for [the Winns], [McKinlay] was forced to admit that his testimony was inconsistent, that he never mentioned this "hard copy file" or his "custom and practice" in his deposition, . . . and that he had no "independent recollection" of reviewing [Pulmonologist's] recommendation. Importantly, [McKinlay] was forced to admit that "it would be pure speculation" on his part to assume that he saw [Pulmonologist's] recommendation.
>
> The next day, knowing they had been ambushed with this new version of events, [the Winns] nevertheless opposed [McKinlay's] motion for a mistrial. . . . And during [the] following ten days of trial—which included two weekends—[the Winns] did not seek any relief from the court regarding [McKinlay's] changed testimony. They did not move to strike the testimony. They did not request a continuance. They did not seek to recall

> any witness at [McKinlay's] expense or otherwise. They did not ask for any curative jury instructions.
>
> Rather, it appears that counsel for [the Winns], who are very experienced and successful trial lawyers, believed the damage to [McKinlay's] credibility outweighed any irregularity or surprise. And from the court's vantage point, this was a sound trial strategy. Given . . . the jury's finding that [Rocky Mountain] breached the standard of care, it is reasonable to assume the jury did not believe [McKinlay's] new version of events or otherwise find him credible on this issue.

(Footnotes omitted.) Ultimately, the court found that the Winns "were not prejudiced by the alleged misconduct."

¶26 As to two of McKinlay's prior patients dying from pulmonary embolisms, the court stated that the Winns "never requested the opportunity to pursue this line of questioning." It explained that the Winns' "assertion that 'the door was opened' was in response to [McKinlay's] objection and in opposition to [McKinlay's] motion for a mistrial" following Expert's testimony on this topic. And it determined that the Winns could not "transform their 'the door was opened' argument in opposition to a mistrial motion into an affirmative but unspoken request to explore this line of questioning when [McKinlay] testifie[d] a week later in his case-in-chief." Regarding the court's statement made in denying the mistrial motion that it was "not saying the door is open that then allows the [Winns] to continue along these lines of questions," the court highlighted the context of its statement, noting that it was made when evaluating whether Expert's "unresponsive statement" warranted a mistrial, not when deciding the never-presented question of whether the Winns should be able to question McKinlay about the deaths. Thus, the court concluded, "it is not fair to say that the court

'denied' [the Winns] the opportunity 'to qualify, explain, or limit the impact of [McKinlay's] misleading testimony.'" Finally, the court observed that the jury actually heard Expert's testimony that two of McKinlay's prior patients died from pulmonary embolisms, and that the court "did not strike [this testimony] or instruct the jury to disregard it."

¶27 The Winns now appeal.

## ISSUES AND STANDARDS OF REVIEW

¶28 First, the Winns contend that the district court abused its discretion by denying their motion for a new trial. "We apply an abuse of discretion standard in reviewing a trial judge's decision to grant or deny a new trial . . . ." *USA Power, LLC v. PacifiCorp*, 2016 UT 20, ¶ 30, 372 P.3d 629 (cleaned up).

¶29 Second, the Winns assert that the district court "abused its discretion in preventing [the] Winn[s] from inquiring into McKinlay's experience of having two prior patients die from a pulmonary embolism." "We grant a trial court broad discretion to admit or exclude evidence and will disturb its ruling only for abuse of discretion." *Daniels v. Gamma West Brachytherapy, LLC*, 2009 UT 66, ¶ 32, 221 P.3d 256 (cleaned up).

## ANALYSIS

### I. Denial of the Winns' Motion for a New Trial

¶30 The Winns contend that the district court abused its discretion by denying their motion for a new trial. We disagree.

A.    The Prejudice Requirement

¶31 The district court determined that the change in McKinlay's testimony regarding his presumably having seen

Pulmonologist's recommendation prior to Holly's surgery—which change apparently involved the participation of Defendants' counsel—constituted both an irregularity and a surprise under rule 59(a) of the Utah Rules of Civil Procedure. But the court was correct that this determination alone was not a sufficient basis upon which to order a new trial.

¶32 When a district court identifies an irregularity or surprise in the proceedings, it must also find that the complaining party was prejudiced by those circumstances before it orders a new trial. *See Peterson v. Hyundai Motor Co.*, 2021 UT App 128, ¶ 32, 502 P.3d 320 ("[A]fter determining that an error or impropriety of some kind exists, a trial court must determine whether the identified errors or improprieties are significant enough to warrant a retrial."), *cert. denied*, 509 P.3d 768 (Utah 2022). "Indeed, rule 59 is, by its terms, 'limited by Rule 61,' the rule discussing harmless error." *Id.* (quoting Utah R. Civ. P. 59(a)); *see generally* Utah R. Civ. P. 61 (requiring courts to "disregard any error or defect in the proceeding which does not affect the substantial rights of parties").

¶33 The Winns argue that although the district court "is granted deference in ruling on a motion for a new trial, when attorney misconduct is involved[,] that deference should be viewed more narrowly on appeal." But even the cases the Winns cite do not support an abandonment of the prejudice requirement in situations where an irregularity or surprise is tied to attorney misconduct. *See Nelson v. Trujillo*, 657 P.2d 730, 734 (Utah 1982) ("The proper remedy for *prejudicial* attorney misconduct is to order a new trial." (emphasis added)), *abrogated on other grounds by Smith v. Volkswagen SouthTowne, Inc.*, 2022 UT 29, 513 P.3d 729; *Kearl v. Okelberry*, 2010 UT App 197U, para. 11 ("The irregularity must be such that either party was prevented from having a fair trial. Attorney misconduct warranting a new trial must be real and substantial and such as may reasonably be supposed would affect the result." (cleaned up)); *Pope v. Babick*, 178 Cal. Rptr. 3d

42, 51 (Cal. Ct. App. 2014) ("But when attorney misconduct is at issue, we must independently consider whether the misconduct resulted in prejudice. Prejudice exists if it is reasonably probable that the jury would have arrived at a verdict more favorable to the moving party in the absence of the irregularity or error."). Even in a recent case involving an asserted irregularity based on attorney misconduct—the intentional flouting of a court order—we expressly analyzed whether the misconduct was prejudicial, determined that it was not, and affirmed the outcome at trial. *See Ameritech College Holdings, LLC v. Aiken*, 2025 UT App 6, ¶¶ 51–60. So here, the Winns were required to demonstrate prejudice to warrant a new trial.

B.    The Winns' Failure to Preserve Their Prejudice Argument

¶34    After finding an irregularity and surprise, the district court determined that the Winns were not prejudiced by this circumstance. The Winns contend that they were prejudiced because if they had known McKinlay's trial version of events prior to trial, they would have brought an informed consent claim that likely would have succeeded. The Winns explain,

> [I]f McKinlay had timely amended his deposition testimony and/or his response to the admission request, [the] Winn[s] would have amended [their] complaint to include claims for lack of informed consent. . . . Because it is undisputed that McKinlay failed to have an informed consent conversation with [Holly], it is almost certain the outcome of the trial would have been different if the jury had been answering the question of McKinlay's negligence based on an informed consent claim rather than a claim of bad clinical judgment.

¶35    In response, Defendants contend that the Winns have not preserved this argument because they did not raise it during trial or in their motion for a new trial. We agree.

¶36    "Under our preservation rule, any issue brought on appeal must be sufficiently raised to a level of consciousness before the trial court such that the court has an opportunity to rule on it." *State v. Centeno*, 2023 UT 22, ¶ 54, 537 P.3d 232 (cleaned up). Because the Winns did not present their informed consent theory of prejudice to the district court, our preservation rule requires that we decline to consider it unless an exception to the preservation rule applies. *See id.* ¶ 57.

¶37    In an effort to avoid the preservation rule's preclusion of our consideration of their informed consent theory of prejudice, the Winns argue (1) that the policies underlying the preservation rule will not be served if we do not consider their informed consent theory and, alternatively, (2) that we should apply the exceptional circumstances exception to the preservation rule or create a new exception to the preservation rule for instances of attorney misconduct. We address these arguments in turn.

1.    The policies underlying the preservation rule

¶38    The Winns contend that, notwithstanding their failure to present their informed consent theory of prejudice to the district court, we should still consider the theory because "the purposes of the preservation rule [will not be] served" if we do not.

¶39    When determining whether an issue has been preserved for appeal, both this court and our supreme court have occasionally conducted a case-specific analysis based on the policies underlying the preservation rule. *See, e.g.*, *Kell v. State*, 2012 UT 25, ¶¶ 10–12, 285 P.3d 1133; *Patterson v. Patterson*, 2011 UT 68, ¶¶ 10–21, 266 P.3d 828; *McKell v. McKell*, 2024 UT App 72, ¶¶ 21–30, 549 P.3d 654, *cert. denied*, 558 P.3d 89 (Utah 2024); *State v. Granere*, 2024 UT App 1, ¶¶ 28–32, 543 P.3d 177, *cert. denied*, 558 P.3d 87 (Utah 2024). However, such case-specific application of those policies is not typically required. When it is clear that an appellant is raising an entirely new legal theory on appeal, we may simply apply the preservation rule and decline to address the

newly raised issue. *See, e.g.*, *Whittingham, LLC v. TNE Ltd. P'ship*, 2024 UT 23, ¶¶ 54, 56–65, 554 P.3d 924 (declining to review four distinct legal theories raised for the first time on appeal, without conducting an analysis based on the policies underlying the preservation rule); *Hillam v. Hillam*, 2024 UT App 102, ¶¶ 34, 37, 554 P.3d 1137 (determining that the appellant's theory on appeal was "an issue, not an argument, and [that] it therefore needed to be preserved below," and "declin[ing] to consider" the theory based solely on the fact that it had not been raised below). Only in close cases might it be necessary for us to conduct case-specific analyses based on the policies underlying the preservation rule. *See McKell*, 2024 UT App 72, ¶ 30 (observing that where the appeal presented a "close case[]" as to whether the appellant was asserting "a *new argument*" in support of a preserved theory or "an *entirely distinct* [and therefore unpreserved] *legal theory*," it was appropriate to "look at the underlying policies" to make that determination (cleaned up)). Because the Winns' informed consent theory of prejudice is clearly a distinct legal theory that was not raised below, the preservation rule requires us not to consider that theory on appeal, regardless of any particularized application of the policies underlying the rule.

¶40 Moreover, even if we were to deem this a close case and base our preservation determination on a particularized application of the policies underlying the preservation rule, we would reach the same decision. In *Patterson v. Patterson*, 2011 UT 68, 266 P.3d 828, our supreme court indicated that "[t]he two primary considerations underlying the [preservation] rule are judicial economy and fairness." *Id.* ¶ 15. Regarding judicial economy, the court noted that "requiring a party to raise an issue or argument in the trial court gives the trial court an opportunity to address the claimed error, and if appropriate, correct it," thus "avoid[ing] unnecessary appeals and retrials." *Id.* (cleaned up). And regarding fairness, the court declared that "[i]t generally would be unfair to reverse a district court for a reason presented first on appeal" because "[u]nder our adversary system, the

responsibility for detecting error is on the party asserting it, not on the court." *Id.* ¶ 16. "Notions of fairness [also] dictate that a party should be given an opportunity to address the alleged error in the trial court." *Id.* Moreover, "requiring preservation of an issue prevents a party from avoiding the issue at trial for strategic reasons only to raise the issue on appeal if the strategy fails." *Id.* (cleaned up). Specific application of these principles in this case likewise compels the conclusion that the Winns did not preserve the issue of whether the irregularity and surprise in this case prejudiced them by forestalling their pursuit of an informed consent claim.

¶41    As to judicial economy, not only did the Winns fail to provide the district court with an opportunity to address whether the irregularity and surprise prejudiced them in this way, but they specifically steered around the issue of informed consent when the court, noticing the direction of the Winns' counsel's questions to McKinlay, said,

> This line of questioning is making it sound like it's an informed consent case if [information was] not provided which would have impacted her choice of proceeding with the surgery[] [or] proceeding with the different surgeon[.] [A]nd you're welcome to continue. I just want to be very clear [that] if it starts to look like an informed consent issue, then there may be a revisiting of my ruling upon the informed consent.

Rather than grasp this opportunity to develop testimony on and put before the district court the issue they now ask us to resolve, the Winns decided to reorient their questions and avoid the issue of informed consent. The Winns also did not raise the issue in

their post-trial motion.[4] If the court had confronted this question at either juncture—during trial or in the post-trial motion—and ruled in the Winns' favor, the Winns' appeal would have been avoided.[5]

¶42    As to fairness, we acknowledge an equitable appeal to the Winns' argument that the traditional notion of what is fair to an opponent in the preservation context—i.e., that the opponent be given an opportunity in the district court to address an alleged error arising at trial—may hold less weight when the opponent has itself acted unfairly by engaging in an attorney-assisted ambush. However, there are remedies for that unfairness that do

---

4. We are somewhat sympathetic to the difficulty the Winns point to of responding during the "heat of battle" to irregularities and surprises at trial. But the trial continued for ten days, with two intervening weekends, after McKinlay's surprise testimony. And the Winns did not file their rule 59 motion until some five months after the conclusion of the trial. Thus, the Winns had ample opportunity to raise this issue outside the immediate heat of battle.

5. The Winns assert that if they "had argued, and if the trial court had agreed, that prejudice resulted from not having the opportunity to assert a claim based on lack of informed consent, the only difference in the proceedings would be the [parties'] respective positions on appeal." But we do not assume an opponent's potential appeal to be a foregone conclusion when assessing a party's actions related to judicial economy. Instead, we ask whether the district court received a proper opportunity to address the question and whether the party's actions likely caused unnecessary additional litigation. *See Patterson v. Patterson*, 2011 UT 68, ¶ 15, 266 P.3d 828. Regardless of what Defendants may or may not have done if the Winns had raised this issue to the district court, *this* appeal may have been avoided if the Winns had raised the issue below.

not include abandonment of the preservation requirement.[6] On the other hand, the preservation rule is the sole mechanism for

---

6. Rule 26 of the Utah Rules of Civil Procedure dictates that "[i]f a party learns that a disclosure or response is incomplete or incorrect in some important way, the party must timely serve on the other parties the additional or correct information if it has not been made known to the other parties." Utah R. Civ. P. 26(d)(5). This mandate applies to "responses given in a deposition." *Arreguin-Leon v. Hadco Constr. LLC*, 2018 UT App 225, ¶ 21, 438 P.3d 25 (cleaned up), *aff'd*, 2020 UT 59, 472 P.3d 927. "If a party fails to disclose or to supplement timely a disclosure or response to discovery, that party may not use the undisclosed witness, document, or material at any hearing or trial unless the failure is harmless or the party shows good cause for the failure." Utah R. Civ. P. 26(d)(4).

In this case, the number and nature of the patient files Rocky Mountain maintained for Holly was undeniably important. We therefore agree with the district court that "[o]nce [McKinlay] 'realized' that [he] must have personally reviewed [Pulmonologist's] recommendation because it was in the 'hard copy paper file,' he had an absolute duty to supplement Response to Request No. 3." *See Peterson v. Hyundai Motor Co.*, 2021 UT App 128, ¶¶ 48–49, 502 P.3d 320 (concluding that "in the ebb and flow of [the] particular case, [the plaintiffs' expert's] opinion about the precise location of [a] pinch point was important enough to trigger supplementation obligations" and that when the plaintiffs learned "at least a week prior to trial" of the expert's intent to change his opinion, they had an "obligation to supplement their expert disclosures . . . earlier than" "the night before [the expert's] scheduled trial testimony"), *cert. denied*, 509 P.3d 768 (Utah 2022). McKinlay likewise had a duty to supplement his relevant deposition testimony prior to trial. *See id.*; *Arreguin-Leon*, 2018 UT App 225, ¶ 21. We cannot condone McKinlay's failures to fulfill these obligations, and we encourage parties facing such rule

(continued…)

preventing the unfairness of "a party . . . avoiding [an] issue at trial for strategic reasons only to raise the issue on appeal if the strategy fails." *Id.* (cleaned up). Thus, notwithstanding the ambush, the Winns were not absolved of their own "responsibility for detecting error" and giving the district court an opportunity to provide appropriate relief. *Id.*

¶43 As the district court noted, the Winns had ten days of trial after their discovery of McKinlay's change in testimony to raise the issue, and during that time they "did not seek any relief from the court regarding [McKinlay's] changed testimony." Instead, as the district court explained, "[d]espite their surprise, [the Winns] were able to effectively cross examine [McKinlay] and employ his inconsistent testimony to their full advantage" by forcing him "to admit that his testimony was inconsistent" and "that 'it would be pure speculation' on his part to assume that he saw [Pulmonologist's] recommendation." As the district court further noted, "it appears that counsel for [the Winns], who are very experienced and successful trial lawyers, believed the damage to [McKinlay's] credibility outweighed any irregularity or surprise." We agree that the Winns' trial counsel applied a sound—and at least somewhat successful—strategy, since the jury's finding that Rocky Mountain breached the applicable standard of care suggests that the jury did not find McKinlay credible on this issue. To now allow the Winns to try a different strategy because they did not obtain the result they desired would frustrate the purposes of our preservation rule.

¶44 For the foregoing reasons, we conclude that the Winns' informed consent theory of prejudice was not preserved.

---

violations to seek appropriate relief, including the application of rule 26(d)(4).

2.      Exceptions to the preservation requirement

¶45    The Winns next contend that we should apply the exceptional circumstances exception to the preservation rule or create a new exception for instances of attorney misconduct.

¶46    Our supreme court has stated, "Our preservation requirement is self-imposed and is therefore one of prudence rather than jurisdiction. Consequently, we exercise wide discretion when deciding whether to entertain or reject matters that are first raised on appeal. We have exercised this discretion to recognize some limited exceptions to our general preservation rule." *Patterson*, 2011 UT 68, ¶ 13. The exceptional circumstances doctrine is one of those exceptions. *Id.* We apply this doctrine "to reach an unpreserved issue where a rare procedural anomaly has either prevented an appellant from preserving an issue or excuses a failure to do so." *State v. Hararah*, 2023 UT App 77, ¶ 22, 534 P.3d 1129 (cleaned up), *cert. denied*, 540 P.3d 79 (Utah 2023).

¶47    Even assuming arguendo that the circumstances here qualify as a rare procedural anomaly, the exceptional circumstances exception does not apply. The Winns were not prevented from raising this issue to the district court. And they have not presented us with reasoning as to why they should be excused for their failure to do so, other than their assertion that "McKinlay (and his insurer . . . ), [should not be allowed to] get away with the very type of ambush the rules were designed to prevent." But excusing the Winns' failure to raise this issue to the district court would ignore the strategic choices they made, particularly in light of the length of the trial and their rule 59 motion. We are unprepared to accept a sweeping rule that changed testimony offered with the knowledge or encouragement of counsel automatically qualifies as an exceptional circumstance that obviates the need to comply with our preservation requirement. We therefore decline to apply the exceptional circumstances exception here.

¶48 The Winns further contend that we should recognize a new exception to preservation, saying, "An additional exception should be recognized when attorney misconduct is involved." They explain, "When an attorney is involved in breaking the rules and walks into the courtroom on the first day of trial with designs on presenting a previously undisclosed new version of facts for the jury to consider, fairness is impossible and prejudice is unavoidable."

¶49 The Winns have not briefed the question of whether this court, as opposed to the supreme court, has the authority to create new exceptions to the preservation rule. Regardless, we are not persuaded that we should create the proposed new exception here. The Winns' stated rationale for doing so—that "[w]hen an attorney is involved in breaking the rules . . . , fairness is impossible and prejudice is unavoidable"—is squarely at odds with our cases that do not presume prejudice but, instead, require a showing of prejudice to merit a new trial based on attorney misconduct. *See supra* ¶ 33. To adopt the exception the Winns request, we would have to implicitly or explicitly overrule those cases—something we are not prepared to do on the briefing before us, which includes no analysis regarding "the persuasiveness of [that] authority" and "how firmly [it] has become established in the law since it was handed down." *Eldridge v. Johndrow*, 2015 UT 21, ¶ 22, 345 P.3d 553; *see generally id.* (setting forth the factors that a Utah appellate court must consider before overruling precedent).

¶50 In sum, because the Winns have not satisfied the preservation requirement, we decline to consider the informed consent theory of prejudice that they raise for the first time on

appeal. We therefore affirm the district court's denial of the Winns' motion for a new trial.[7]

## II. Evidence of Two Deaths Related to Pulmonary Embolisms

¶51 The Winns also argue that the district court abused its discretion by "[p]reventing" them from asking McKinlay about two prior patients of his who had died from pulmonary embolisms. But we agree with the district court that it never denied such a request.

¶52 Before trial, the Winns did not request that they be allowed to present such evidence. Instead, they agreed for purposes of Defendants' motion in limine that "evidence of prior lawsuits or

---

7. The Winns' appellate challenge to the denial of their motion for a new trial also includes the assertion that if McKinlay had timely supplemented his discovery responses, the Winns "would have engaged in [additional] discovery about McKinlay's 'custom and practice' and disproved the notion that he actually read and chose to disregard the recommendation of [Pulmonologist]." In other words, the Winns cursorily assert on appeal the additional discovery theory of prejudice that they relied on in their rule 59 motion. But that theory is arguably unpreserved as well. *See State v. Fullerton*, 2018 UT 49, ¶ 49 n.15, 428 P.3d 1052 ("[A]n objection that could have been raised at trial cannot be preserved in a post-trial motion."). And even if it was preserved, we are unpersuaded by it. The district court thoughtfully explained its reasoning in response to that argument, *see supra* ¶ 25, and the Winns mount no attack on the court's reasoning. Therefore, to the extent that the Winns rely on appeal on their additional discovery theory of prejudice, their argument falls short. *See Big Game Forever v. Peterson*, 2024 UT App 78, ¶ 19, 551 P.3d 411 ("An appellant who does not meaningfully engage with the district court's reasoning falls short of demonstrating any error on the part of the district court." (cleaned up)).

similar events [is] not generally admissible to show breach of [the standard of] care," though they "reserve[d] the right to introduce evidence of Defendants' prior lawsuits or other acts if Defendants open[ed] the door by implying that [they] are widely respected, always careful, or [if they] otherwise attempt[ed] to bolster [their] image." Likewise, the court granted the motion but "recognize[d] that evidence of this nature [might] become admissible if the trial proceed[ed] in a manner that open[ed] the door to this evidence."

¶53 While the Winns asserted during trial that McKinlay had opened the door, they did not request an opportunity to question McKinlay on this topic. We agree with the district court that the Winns' assertion at trial "that 'the door was opened' was in response to [McKinlay's] objection and in opposition to [McKinlay's] motion for a mistrial" and that the Winns "cannot transform their 'the door was opened' argument in opposition to a mistrial motion into an affirmative but unspoken request to explore this line of questioning when [McKinlay] testifie[d] a week later in his case-in-chief." Likewise, the district court's statement in response—namely, that it was "not saying the door [was] open that then allow[ed] the [Winns] to continue along these lines of question"—was related to Expert's testimony and whether it constituted grounds for a mistrial. It was not a ruling on a request that the Winns be allowed to question McKinlay about the same subject.[8] That request was never presented to the

_____

8. The Winns argue that "[b]ecause McKinlay was allowed to mislead the jury into believing his experience included prior patients that had post-operative bleeds, but not any deaths from a pulmonary embolism, confidence in the jury's verdict is greatly undermined when the truth would have removed this false impression." We note, however, as did the district court, that the jury actually heard evidence that two of McKinlay's prior patients had died from pulmonary embolisms and that this testimony was not stricken or subject to a curative instruction. Thus, even had

(continued…)

court. Because the Winns never asked the district court to permit them to question McKinlay about patients who had died due to pulmonary embolisms, the court did not commit the error the Winns assert.

CONCLUSION

¶54    The district court did not abuse its discretion in denying the Winns' motion for a new trial, and the court did not deny the Winns an opportunity to cross-examine McKinlay about patients who died due to pulmonary embolisms. We therefore affirm.

———————

there been an error, the Winns would have difficulty demonstrating that they were prejudiced by it.